14009

SCHULTZ v. BENEFIT ASS'N OF RAILWAY EMPLOYEES OF CHICAGO, ILL.

(178 S. E., 867)

*Messrs. Thomas, Lumpkin* and *Cain,* for appellant,

*Messrs. N. A. Theodore, Nat Turner,* and *J. Laurens Mills,* for respondent,

February 23, 1935.

The opinion of the Court was delivered by MR. C. T. GRAYDON, ACTING ASSOCIATE JUSTICE.

The plaintiff in this action, Glenn O. Schultz, is an employee of the Southern Railway Company. In 1922 he was a baggage master with headquarters at Rock Hill, S. C. There is an arrangement between the Southern Railway Company, its employees and the defendant, Benefit Association of Railway Employees, wherein and whereby the association insures the employees, and the premiums on the policies are collected by deducting the same from the amounts due the employee by the Southern Railway Company.

On April 11, 1922, at the time this plaintiff was a baggage master, he took out a policy with the defendant as-

sociation which agreed to pay the sum of $1,000.00 in case of accidental death and an indemnity of $50.00 a month for disability caused by accident or illness. The monthly premium charged upon this policy was $1.65, and the plaintiff was placed in a class commonly known by the defendant as Class B.

The premiums upon this policy were promptly paid by the method above set forth, and on March 1, 1925, the plaintiff herein was approached by an agent of the defendant with the proposition to exchange the policy of April 11, 1922, and it is around this exchange of policies that the case, in a measure, turns.

The policy which was offered and which the agent insisted that the plaintiff take was one which paid $2,000.00 principal sum and $70.00 per month indemnity for accident and illness, and the premium to be charged on this policy was $3.70 a month. In other words, although the principal sum of the policy as to accidental death was double and the amount paid per month by way of indemnity for accident or illness was increased about 40 per cent., yet the premium on the policy was more than double that of the original policy. The agent, according to the testimony of Schultz, informed Schultz at the time this second policy was delivered that the advantage of this policy over the policy of April 11, 1922, was that this policy was noncancelable, and that, so long as the premiums were paid upon it, the policy would remain in full force and effect.

On May 1 Schultz had changed his occupation with the railroad from that of baggage master to a ticket seller in the Union Station at Columbia. This entitled him to a different classification with the association, and he made application to change merely the classification of his policy from Class B to Class AA, the most preferred class. Of course, the occupation was much less hazardous, and the premium rate, it seems, is based to a large degree upon the character and kind of work which the employee is engaged in. The pre-

mium of $3.70 was reduced to $2.20 on account of this preferred class, and the policy was supposed to be and was identical with the policy of March 1, 1925, with the exception of the change of classification.

As before stated, the case, to a large measure, revolves around the construction of the two policies issued on March 1, 1925, and changed as to classification only on May 1, 1925. Schultz claims that, at the time the agent sold this policy to him, the agent represented to him, in the presence of his brother, that the advantage of this policy was that the same was noncancelable and showed to him a provision in the policy which is written in large type "Non Cancellable." If the policy is unambiguous as to its terms, then no representation made by the agent could bind the company, but, if the policy was ambiguous, then a different situation arises, and the construction placed upon it by the agent, if it was warranted by the language of the policy, would be binding upon the company.

In addition to the wording of the policy itself, which states in large type that the same is noncancelable, the testimony clearly discloses that the policy was in fact misunderstood by a great number of persons who accepted the same and that the association realized that the same was confusing. This is evidenced by a letter to the insurance commissioner written by one G. Donovan, the assistant vice-president of the association. In this letter Donovan makes the following statement to the insurance commissioner with reference to the type of policy here under consideration: "The Form 3 policies were issued for a little bit more than two years before it became apparent to the National Office that regardless of competition, too many purchasers of these policies misunderstood the Association's right and believed themselves possessed of policies which could not be terminated by affirmative action of the Association."

Further on, in this same letter, Donovan states: "Form 3 policies are what might properly be called term non-cancella-

ble policies." Mr. Kellar, vice-president of the company, testified that it was the purpose and intention of the company to cancel out all of the policies of this type, and it can also be inferred from his testimony that there was considerable confusion about whether or not the policies were noncancelable.

The wording of the policy itself is confusing, ambiguous, and not at all clear. As before stated, in one place the policies are termed noncancelable, and down in the miscellaneous provisions, which are written in small type, the right is given to refuse to accept premiums on the policy for a renewal period. The two theories of the policy are inconsistent and the terms of the same are at least inconsistent.

Schultz testified that, at the time the policy was sold to him, the moving consideration of his making the change and paying the high rate was the fact that the policy was noncancelable. There is no dispute of this testimony. The agent who talked to Schultz and sold him the policy did not testify.

Schultz promptly paid all premiums due, and in May, 1933, when the premiums were fully paid and had been paid for a period of eight years, the company refused to accept additional premiums and thereby canceled the policy. There was no notice given to Schultz of the company's intention to do this. No premiums were returned. No offer was made to right the wrong which he claims had been done him.

Schultz then brought action against the company for damages, both actual and punitive, claiming that the cancellation of the policy was in breach of the contract and was accompanied by fraudulent acts.

This Court had held repeatedly that, where an insurance company refuses to collect premiums and it is clearly shown that the intention of the company is to cancel out policies which are existent and upon which rights have accrued, such action on the part of the company will sustain a verdict for punitive damages. *Wilkes v. Carolina Life Ins. Co.,* 166 S. C., 475, 165 S. E., 188; *McLoud v. Metropolitan Life Ins. Co.,* 167 S. C., 309, 166 S. E.,

343; *Sutton v. Continental Casualty Co.*, 168 S. C., 372, 167 S. E., 647; *Mack v. Life & Casualty Ins. Co.*, 171 S. C., 350, 172 S. E., 305.

If this policy was noncancelable under the agreement with Schultz, it stands in the same position as the policies referred to in the cases above set forth. The policy is ambiguous. It is a trap to catch the unwary. It was conceived, according to the undisputed testimony, for the purpose of competing with other companies in an effort to hold out the belief that the policy was substantial and noncancelable. It was so understood by many of the policyholders to such an extent that the vice-president had to write the insurance commissioner an explanatory letter in connection therewith. Schultz was not the only person who believed that the policy was noncancelable, and this idea could not have been a creation of Schultz' mind alone. The provision in the policy that the same was noncancelable was a good selling point, but it did not develop to be a good paying point.

Under the well-recognized rules of this and of other enlightened jurisdictions, the policyholder must be protected against confusing statements in policies, and, wherever there are two constructions that can be placed upon the policy, the construction most favorable to the policyholder will be adopted. Under our view of the case, there was ample testimony to warrant the jury in finding that, at the time of the delivery of the policy, the same was represented and guaranteed to be noncancelable; that the policy contract itself was ambiguous and was understood by many to be noncancelable; that the company accepted the premiums of the plaintiff for years without question and then canceled the policy and refused to accept further premiums without notice. Unfortunately for Schultz, about the time the policy was canceled, he developed a duodenal ulcer of the stomach and he is no longer insurable. This would give basis for actual damages if the policy was, in fact, noncancelable, and, if the company willfully refused to accept premiums upon the

policy for the purpose of canceling it and destroying the rights of the plaintiff, punitive damages would be sustained, for the breach of the contract would be accompanied by fraudulent acts.

We have not taken up in detail each exception of the defendant, but this discussion disposes of the issues raised in said exceptions.

The judgment of this Court is that the judgment of the County Court be, and the same is hereby, affirmed.

MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.