CHARLES M. WILSON, and ROSE JOHNSTONE,
*Plaintiffs and Respondents,*

vs.

HAWKEYE CASUALTY COMPANY, a corporation,
*Defendant and Appellant.*

(No. 2452; March 21, 1950; 215 Pac. (2d) 867).

142

For plaintiffs and respondents the cause was submitted on the brief of Kline and Kline of Cheyenne, Wyoming and oral argument by Mr. Arthur Kline.

For defendant and appellant the cause was submitted on the brief and oral argument of Mr. Joseph B. Sullivan of Douglas, Wyoming.

144

## OPINION.

RINER, Chief Justice.

The District Court of Laramie County disposed of this case without a jury and awarded a judgment in favor of the plaintiffs in an action brought in that court by Charles M. Wilson and Rose Johnstone as plaintiffs against the defendant Hawkeye Casualty Company, a corporation. That part of the judgment awarded to Charles M. Wilson is not questioned in this direct appeal proceeding. The only controversy to be considered is the one arising because the plaintiff, Rose Johnstone, was by this judgment also allowed a recovery against the defendant for the amount she claimed with interest and costs. The action was brought on an insurance policy issued by the defendant Hawkeye Casualty Company and the controlling question to be resolved is whether the loss suffered by the plaintiff, Rose Johnstone, is legally covered by it.

Plaintiff's petition consists of two alleged causes of action, the first of which deals with the insured loss by the plaintiff Wilson and concerning which there is no dispute. The second cause of action is that set forth on behalf of the plaintiff, Rose Johnstone, and is in substance as follows:

It adopts the first three paragraphs of the first cause of action on behalf of Charles M. Wilson which states that he and his wife, Julia, were the owners and occupants of a three story dwelling house whose location is duly described; that the defendant is an Iowa corporation qualified to transact business in Wyoming, and that about December 15, 1946 Wilson and his wife entered into an insurance contract with the defendant which issued to them a "residence and outside theft policy" whereby in consideration and payment of the required premium the defendant "agreed to pay for loss by theft from the above described premises of any jewelry, furs, or other personal property" not to exceed the sum of $1,000; that this policy remained in force for one year, expiring by the limitation thereof on December 15, 1947; that this policy provided that "the mysterious disappearance of any insured property should be presumed to be due to theft", Exhibit A attached to and made a part of said pleading being stated to be a true copy of the instrument in question.

The cause of action in plaintiffs' petition setting forth the claim of Rose Johnstone then averred that she was an intimate friend of the Wilsons and that on April 7, 1947 and for several weeks previous thereto she had been living with them at their aforesaid residence as their guest and a member of their household; that she had at the time with her among her possessions in said dwelling house a certain diamond ring of the reasonable value of $1600; that during this time

she was in ill health and that on April 7, 1947 she left the residence of her friends and went to Rochester, Minnesota for medical treatment and remained there until about May 21, 1947 when she returned to said residence. Paragraph 4 of the alleged second cause of action on behalf of Rose Johnston reads verbatim as follows:

"That at the time that plaintiff left said insured premises, and went to Rochester, Minnesota for medical treatment as aforesaid, she did not wish to take with her any except the most essential of her belongings and with the knowledge and consent of said Julia G. Wilson and Charles M. Wilson, she left most of her personal possessions, including said diamond ring, at said insured premises; that when she returned from Rochester, Minnesota, she immediately went to the place in said dwelling house where she had. secreted said diamond ring but found it missing and that it either had been stolen or had mysteriously disappeared; and although strict search has been made therefor, no trace of said diamond ring has ever been found."

It is then stated that Charles M. Wilson and his wife acting for and in behalf of Rose Johnstone immediately notified the defendant of the loss of said ring and thereafter, at its request, furnished the defendant with statements and proof of loss and the Wilsons and this plaintiff have in every way complied with the terms and conditions of said policy and done all the things required of them to be done; and that more than thirty days have elapsed since this proof of loss of said ring was submitted to the defendant.

Paragraph 6 of the alleged second cause of action pleads verbatim that:

"during all times herein mentioned, said residence and outside theft policy of insurance was in full force and effect and that this plaintiff is entitled to bring this action in her own behalf for the reason that she has

a beneficial interest in said contract of insurance by reason of the fact that at the time of the theft, or mysterious disappearance of said diamond ring, she was residing in said insured premises as a guest and a temporary member of the household of said insured."

The remainder of the pleading states that the defendant has not paid to the plaintiff, Rose Johnstone, the value of the ring or any part thereof or supplied her with another ring of equal value and she accordingly requests judgment against the defendant for the sum of $975 with interest and costs.

The answer of the defendant, after admitting that it is willing to pay the plaintiff Charles M. Wilson the sum of $25 loss for which he sued in the first cause of action in plaintiffs' petition, answers the Johnstone alleged second cause of action by denying:

"each and every allegation contained in the paragraphs 4 and 6 of the second cause of action, and further denies that the Plaintiff Rose Johnstone had an insurable interest in the Policy of Insurance and her loss was not covered thereby."

Plaintiff replied to this answer by denying "each and every allegation contained" in its second paragraph, which is the part quoted above.

Only those portions of the policy of insurance involved here which throw any light upon the property is covered by it, now the important question before us, are below excerpted, viz.: We may note first that the policy itself is designated "Residence and Outside Theft Policy." Under the heading "Declarations" Item 1 is:

"Name of Insured JULIA G. WILSON & CHARLES WILSON" Item 3 is as follows:

"The insurance afforded is only with respect to such and so many of the following coverages and sections

thereunder as are indicated by a specific limit of insurance applicable thereto, subject to all the terms of this policy having reference thereto.

| Coverages | Limits of Insurance | Premiums |
|---|---|---|
| A. Theft from the Premises or a Depository | | |
| (a) Jewelry, Sterling Silver and Furs | $ | $ |
| (b) All Other Property, | $ | $ |
| (a) and (b) Combined, | $1,000.00 | $18.00 |
| (c) Specified Articles, separately described and enumerated. (Such articles are not covered under sections (a) or (b) | $ | $ |
| B. Theft Away from the Premises | $1,000.00* | $ Nil |
| *Subject to limit of $100 on money & $500 on securities and U. S. War Savings Stamps." | Total Premium | $18.00 |

Under the heading "Insuring Agreements" following the statement: "HAWKEYE CASUALTY COMPANY (A Stock Company, Herein Called the Company) Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:" appear:

"I Coverage A—Theft from the Premises or a Depository. To pay for loss by theft from the premises or, if the property has been placed therein by the In-

sured for safekeeping, from within any bank, trust or safe deposit company, public warehouse, or occupied dwelling not owned or occupied by or rented to the insured, of such of the following classes of property as are indicated by a specific limit of insurance applicable thereto in the declarations:

(a) jewelry, sterling silver and furs, which words for the purpose of this insurance mean Jewelry, watches, necklaces, bracelets, gems, precious and semi-precious stones, articles of gold, platinum and sterling silver, furs, and articles containing fur which represents their principal value, not included in section (c) hereof:

(b) all other property, not included in section (c) hereof;

(c) specified articles, separately described and enumerated in section (c) of Coverage A in the deductions.

To pay for damage to the premises and to the insured property at the premises or such depository caused by theft or attempt thereat, and for damage to the interior of that part of any building occupied by the insured at the premises and to the insured property therein caused by vandalism or malicious mischief, provided that with respect to damage to the building the insured is the owner thereof or is liable for such damage.

With respect to loss occurring at any part of the premises not occupied exclusively by the insured's household, this insuring agreement applies only to property owned or used by the insured or a permanent member of his household or owned by a residence employee thereof.

Coverage B—Theft Away from the Premises.

To pay for loss or damage by theft or attempt thereat, vandalism or malicious mischief away from the premises of personal property owned or used by the insured or a permanent member of his household or owned by a residence employee thereof.

This coverage does not apply to:

(a) property pertaining to the business or profession of such person;

(b) property while in any dwelling owned or occupied by or rented to such person except while temporarily residing therein and then only during the first sixty days thereof;

(c) loss of property of residence employees unless at the time of loss they are engaged in the employment of the insured or a permanent member of his household and the property is in their custody, or the property is at a temporary residence of the insured or a permanent member of his household, as aforesaid;
(d) loss covered in whole or in part under Coverage A or Insuring Agreement III.

IIApplication of Insurance while the Premises are Rented to Another

Such insurance as is afforded under Coverage A applies while the premises are rented by the insured to another for use as a private residence only, subject to the following provisions:

1. the insurance applied only with respect to property owned by the insured, a permanent member of his household or a residence employee of the insured;
2. the insurance does not apply (a) to money, securities, stamps, jewelry, watches, necklaces bracelets, gems, precious and semi-precious stones, and articles or gold or platinum, nor (b) to loss caused by such tenant or any of his employees or members of his household.

III Removal to Other Premises" (These provisions omitted as not being involved here).

Under the heading "Exclusions" it is stated that the policy does not apply to loss by theft "committed by a relative of the insured permanently residing with insured" or "to property owned by a person not related to the insured who pays board or rent to the insured."

The "Conditions" of the policy are, so far as now material as follows:

"1. Definitions (a) Premises. The unqualified words 'premises' means the premises designated in the declarations, including grounds, garages, stables and other outbuildings incidental thereto.

(b) Theft. The word 'theft' includes larceny, burglarly and robbery. Mysterious disappearance of any insured property shall be presumed to be due to theft.

\* \* \* \*

3. Insured's duties When Loss Occurs. Upon knowledge of loss, the insured shall:

(a) give notice thereof as soon as practicable to the company or any of its authorized agents and also to the police; (b) file proof of loss with the company within sixty days after the discovery of loss, unless such time is extended in writing by the company, in the form and manner required by the company.

Upon the company's request, the insured and every claimant hereunder shall submit to examination by the company, subscribe the same, under oath if required, and produce for the company's examination all pertinent records, all at such reasonable times and places as the company shall designate, and shall cooperate with the company in all matters pertaining to loss or claims with respect thereto.

\* \* \* \*

5. No Benefit to Bailee The insurance afforded by this policy shall not enure directly or indirectly to the benefit of any carrier or bailee.

\* \* \* \*

12. Declarations By acceptance of this policy the insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

The foregoing quotations from the insurance policy involved in this litigation should be examined and considered in connection with the following uncontroverted testimony—the defendant on the trial of the action having introduced no evidence whatsoever—given by Mrs. Julia Wilson, wife of Charles M. Wilson, one of the plaintiffs, and the other plaintiff, Rose Johnstone, the only persons who supplied the oral testimony submitted on the trial of the case.

Mrs. Wilson stated in part and in substance that she is the owner of the premises where she and her husband reside, this property standing in her name; that Hugh Dougherty, an insurance agent, contacted the Wilsons because they do a lot of business with him, and he sold them this policy because he said it would protect all their guests. To the last statement of the witness, defendant objected and excepted as a representation by the agent of the company which was not competent and material; that the policy here in question has been preceded in issuance by three others of similar character; that the following questions and answers appear in this witness' testimony:

"Q. Now, when did you first discuss this matter with Mr. Dougherty; just what did he tell you with respect to the coverage of this policy?
"A. Well, we take an awful lot of insurance on everything that we have up there and he carried it all for us. Well, then he came down and he said, 'I haven't the right kind of insurance policy because you have so much company. That will protect your guests if anything should be missing some time.' That is the only reason we took out the policy.
"Q. Now, before that time did you ever discuss this with Mr. Dougherty?
"A. No, not until he sold us the first one.
"Q. And when he sold you the first policy, had you

discussed what kind of protection you wished with him at that time?

"A. No, he just came down to tell us that he thought we ought to have it and because he thought it a very good insurance policy."

This witness also stated that Mrs. Rose Johnstone, one of the plaintiffs herein, was a very intimate friend of the Wilsons and had been such and a week-end guest for many years at the Wilsons' home; that Mrs. Johnstone came to their home some time after March 1, 1947 and stayed until about April 8, 1947 when she went by plane with them to Rochester, Minnesota; that the trip was taken for Mrs. Wilson's husband; that the husband, Charles M. Wilson, was ill at the time as was also Mrs. Rose Johnstone; that the Wilsons returned home April 20, 1947; that Mrs. Johnstone stayed at Mayos in Rochester, Minnesota two or three weeks after the Wilsons returned; that after she returned from Mayos Mrs. Johstone stayed with the Wilsons about a week; that she never paid board or lodging to them, never was employed by the Wilsons in any way but was just a guest; that the Wilsons have a lot of guests.

That at the time the Wilsons left home for Mayos Mrs. Wilson's mother was living with them; that her mother had been living with them about four years; that Mrs. Wilson's sister had come to be with the mother while the Wilsons were away from home; that a man by the name of Kind who had been with them fifteen years lived in a basement bed room of the Wilsons' home; that these people just mentioned were in the home when the Wilsons returned to it; that Mrs. Johnstone left the ring in question in the home when Mr. and Mrs. Wilson and Mrs. Johnstone left for Mayos; that when Mrs. Johnstone returned to the Wilson home after the Mayo trip the ring could not be

found; that the Wilsons filed proof of loss the next day after the loss was discovered; that Mrs. Wilson thinks the ring was stolen from a box in the sun room of the home to which room no others than household members or guests had access.

On cross-examination this witness testified in part that when the ring was found to be lost they waited for the adjuster to come up; that Mrs. Johnstone had all her mail and personal things in the Wilson home while away on the Mayo trip and also while visiting her mother in Cheyenne for a couple of days before returning to the Wilson home.

Mrs. Rose Johnston testified in part that when she went to the Wilsons' home she took there her clothes and a suitcase and a diamond ring valued at about $1650; that while at Wilsons' she was just a guest, was not employed there and that she left her ring at the Wilson home. It was then stipulated by counsel for the respective parties that:

"Mrs. Johnstone left her diamond ring with Mrs. Lucile Campbell, a sister of Mrs. Julia Wilson, to be placed by the said Mrs. Campbell in a safe place in the Wilson residence; that Mrs. Campbell placed the said ring in a box in the sunroom of the house; that the place where the ring was placed was known only to Mrs. Wilson's mother; and upon Mrs. Johnstone's return from Mayos she was informed by Mrs. Wilson's mother as to the place where the ring had been placed."

Mrs. Johnstone testified also that after spending a couple of days at Cheyenne with her mother she returned to the Wilson home about three weeks after they had arrived there; that all her personal belongings were left at the Wilson home; that the ring has never been found; that Mrs. Wilson reported its loss to the agent of the defendant, Hugh Dougherty, in

Mrs. Johnstone's presence; that Mrs. Wilson thereafter filed proofs of loss with the defendant; that Mrs. Johnstone told the adjuster about the loss; that the statement made by the Wilsons to the agent and the written proof of loss was made by them in behalf of Mrs. Johnstone.

On cross-examination Mrs. Johnstone stated that Mrs. Wilson paid part of Mrs. Johnstone's room rent at the hotel where both occupied the same room at Rochester, Minnesota; that Mrs. Johnstone paid her own clinic bill; that Mrs. Wilson invited Mrs. Johnstone to her Wyoming home and also invited Mrs. Johnstone to go on the plane trip to Mayos as her guest.

Mrs. Wilson testified on recall without objection by defendant that she filed proof of loss with the adjuster for the defendant, Mr. Don Campbell; that the adjuster stated what the coverage of the insurance policy was; that he told Mrs. Wilson that it covered all guests and:

"That you could have a party, lose a lot of fur coats, and the next day the company would be very glad to pay for them. He also, said that if it had been my property it would have been a different affair;"

that the adjuster's statement was made when he came down to find out about all the loss.

The execution and delivery of the insurance policy was admitted by the defendant. The court then heard arguments upon and denied defendant's motion for judgment based on the ground that Mrs. Johnstone's loss was not proven to have been covered by this policy.

From the foregoing pertinent excerpts from the insurance policy in question and the testimony submitted on the trial of the action instituted thereon, the

following facts may especially be noted; that the insured parties under the contract and who paid the premium thereon were Julia G. Wilson and Charles M. Wilson, the limit on this insurance risk being the sum of $1000 whether the theft be from the premises or away from them; that such theft coverage included "jewelry, sterling silver, and furs"; that the defendant agreed with the insurer to pay for loss by theft from the premises of "gems, precious and semi-precious stones. . . . furs, and articles containing fur which represents their principle value." In connection with this promise it is to be observed that there was *no limitation imposed as to ownership of these articles.* However, these insuring agreements when sought to be applied to a loss "occurring at any part of the premises not occuplied exclusively by the insured's household", *is definitely limited* to property owned or used by the insured or a permanent member of his household, or owned by a residence employee thereof. There is also the same limitation imposed as to ownership, when theft away from the premises is involved or when the premises are rented to another. If a limitation as to ownership were intended as to the coverage first above mentioned it could easily and would have undoubtedly been inserted just as it was touching subsequent coverages.

"Mysterious disappearance of any insured property" says the contract "shall be presumed to be due to theft."

Significant on the point whether the insured parties alone were protected under the insurance contract is the requirement therein "upon the company's request the insured and *every claimant hereunder* shall submit to examination by the company, subscribe the same, under oath if required". (Italics supplied). This would seem to contemplate clearly that other persons

than the insured, the payors of the premium on the policy, would make claim for loss suffered by them.

This insurance would not inure "directly or indirectly to the benefit of" the Wilsons for under the stipulated facts they cannot be regarded as bailees of the ring. It is not intrusted to either of them. This clause in the policy is definitely inapplicable here.

It will be recalled that Mrs. Wilson after testifying, without objection, that the defendant's agent who solicited from her and her husband and wrote the policy in question—as well as three others like it—told her "I haven't the right kind of insurance policy because you have so much company. That will protect your guests if anything should be missing some time," stated definitely *"that is the only reason we took out the policy."* It will be further remembered that on recall the same witness also said that thte loss adjuster of the defendant told her that she could have a party, lose a lot of fur coats and the next day the "company would be very glad to pay for them."

With the above observations relative to the important policy provisions in mind, it would appear that the defendant by its statement in coverage "a" insuring against theft from the household premises without restriction as to ownership of the property, and the statements of the authorized agent of the company, Mr. Dougherty, as well as Mr. Campbell, the claim adjuster who came to make settlement of the loss, which we have repeated above, are in full accord relative to the construction which should be given the policy provisions, concerning responsibility for loss claims.

But if this were not so and the coverage "a" aforesaid were to be regarded as ambiguous, then it is ap-

propriate that the following authorities discussing the matter of construction of insurance policies generally and briefly reviewed below should not be overlooked:

In Merchants Mutual Casualty Company vs. Lambert, 90 N. H. 507, 11 Atl. 2d 361, the court stated that: "The language of the policy is to be construed in accordance with the principle that 'the test is not what the insurer intended its words to mean but what a reasonable person in the position of the insured would have understood them to mean' ".

See also Merchants Mutual Casualty Company vs. Melcher, 94 N. H. 174, 49 Atl. 2d 504.

The New York Court of Appeals in McGrail vs. Equitable Life Assurance Society, 292 N. Y. 419, 55 N. E. 2d 483 has also said:

"Such meaning must be given to the terms used as would be ascribed to them by the average man in applying for insurance and reading the language of the policy at the time it was written. Lewis v. Ocean Accident & G. Corp., 224 N. Y. 18, 21, 120 N. E. 56, 57, 7 A. L. R. 1129; Silverstein v. Metropolitan Life Ins. Co., supra. Consistently followed in this State has been the rule that the policy must be construed reasonably and that it must be given a practical construction, not thereby with the result that there is a revision of the policy or an increase of the risk and thus an extension of the resulting liability, but for the purpose of determining what the parties must reasonably have intended by its terms when the policy was written by defendant and accepted by the plaintiff."

Says the Supreme Court of Rhode Island in Joslin vs. Aetna Life Insurance Company, 67 R. I. 261, 21 Atl. 2d 550:

"If we adopt the inference, as we should, that the insurer wrote the policy in good faith, we think we should

also adopt the inference that it was written not solely for expert, scientific, and professional medical men; but that the policy was written in the sense in which the insurer had reason to believe it would be interpreted by the ordinary reader and purchaser." (Citing authorities).

In Gaunt vs. John Hancock Mutual Life Insurance Company, 160 Fed. 2d 599 (certiorari denied 331 U. S. 849, 67 S. Ct. 1736) Judge Learned Hand wrote:

"An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts".

It is not necessary to multiply citations of this character although that could readily be done.

Where the true meaning of insurance policy provisions is drawn in question and in doubt the courts invariably take the view expressed very well in I Joyce, The Law of Insurance (2d Ed.) 590, 591, 592, Section 222 in these words:

"It is a settled rule of construction that in cases of doubt policies of assurance shall be construed strictly against the insurer in accordance with the rule 'verba fortius accipiuntur contra proferentem'. So of two interpretations equally reasonable that construction most favorable to the assured must be adopted, for the language is that of the insurers, and if the terms of the policy are such that reasonable and intelligent men would honestly differ as to its meaning, it will be construed against the insurer; and this is so of equivocal expressions which would narrow the range of the insurer's obligations, and the rule applies to clauses restrictive of the company's liability in an accident policy, and to accident policies generally, and to exceptions, and to conditions and provisions which would narrow the range and limit the force of the principal obligation or lessen the indemnity."

Concerning the same matter 44 C. J. S. 1153-1154, Section 292 states that :

"If there is doubt as to the meaning of the contract it should be construed in the sense in which insurer believed, at the time of the contract, that insured understood it, or in the sense that insured understood it and insurer intended he should understand it, or. as insured reasonably understood it.

"A construction placed on an ambiguous policy by the acts and representations of an authorized agent of the insurance company may be considered as being binding on the company, in the interpretation of the policy, if the construction by the agent is warranted by the language of the policy."

In Rice Oil Company vs. Atlas Assurance Company, 102 Fed. 2d 561, the Court of Appeals for the Ninth Circuit had occasion to review and quote from several Montana decisions thus:

"In the case of Montana Auto Finance Corp. v. British & Fed. Fire Underwriters, 72 Mont. 69, 232 P. 198, at page 200, 36 A. L. R. 1495, the Supreme Court of Montana stated: 'It is a matter of common knowledge that insurance companies prepare their own contracts of insurance. The language of the policy is their language. They do not permit the insured to have a voice in the drawing of his own contract; nor does he negotiate with reference to its terms in the sense that negotiations are carried on before agreements are reached in ordinary contracts. Joyce on Insurance, p. 594. Policies of insurance are invariably complex and are understood by laymen with difficulty, and as a result the insured generally makes a request for the kind of insurance he desires and then signs 'on the dotted line' upon a formidable appearing printed form with the provisions of which the average assured has slight, if any, acquaintance. The policies are prepared by skilled lawyers retained by the insurance companies, who through years of study and practice have become expert upon insurance law, and are fully capable of drawing a contract which will re-

strict the scope of the liability of the company with such clearness that the policy will be free from ambiguity, require no construction, but construe itself. Because of reasons such as these, whenever the contract of insurance is so drawn as to be ambiguous, uncertain, and to require construction, the courts of this country resolve the doubt in favor of the insured and against the insurer, in accordance with the rule contra proferentem.' " (Citing authorities.)

"In a later case, Park Saddle Horse Co. v. Royal Indemnity Co., 81 Mont. 99, 261 P. 880, 883, 884, the Supreme Court of Montana again stated: 'It should be borne in mind that it is a cardinal principle of insurance law that a contract of insurance is to be construed liberally in favor of the insured and strictly as against the insurer. 32 C. J. 1152. Whenever a contract of insurance is so drawn as to be ambiguous or uncertain, and to require construction, and the contract is fairly susceptible of two constructions, one favorable to the insured and the other favorable to the insurer, the one favorable to the insured will be adopted.' "

This language was used in Sanks vs. St. Paul Fire and Marine Insurance Company, 131 Neb. 266, 267 N. W. 454 relative to the matter of construing insurance contracts properly:

"The intention of the parties to a written contract of insurance is primarily to be sought in the language of the instrument itself, but if the intent does not clearly appear from the language itself, the court, in construing the contract, will take into consideration other matters, such as surrounding circumstances, the subject-matter of the contract, the business in which all parties were engaged at the time the contract was made, and the purpose and object of the contract, and will construe the contract, when possible, so as to effectuate the purpose of the contract, which is insurance against loss. 32 C. J. 1148."

In Paulson vs. Industrial Accident Commission et al., 44 Cal. App. 2d 511, 112 Pac. 2d 710, this language

was appropriately used:

"It is true that insurance policies are subject to the same rules of construction which apply to other contracts; that they should be interpreted to give effect to the mutual intention of the respective parties, and that uncertain or ambiguous language contained therein should be construed most strongly against the party who prepares the contract. Maxfield Wilton, etc., v. Industrial Acc. Comm., 19 Cal. App. 2d 606, 65 P. 2d 1354."

It may be noted here that the Supreme Court of California declined to review this decision.

Discussing the matter of construction of several insurance policies in Schultz vs. Benefit Assn. of Railway Employees of Chicago, 175 S. C. 182, 178 S. E. 867, the court remarked that:

"As before stated, the case, to a large measure, revolves around the construction of the two policies issued on March 1, 1925, and changed as to classification only on May 1, 1925. Schultz claims that, at the time the agent sold this policy to him, the agent represented to him, in the presence of his brother, that the advantage of this policy was that the same was noncancelable and showed to him a provision in the policy which is written in large type 'Non Cancellable.' If the policy is unambiguous as to its terms, then no representation made by the agent could bind the company, but, if the policy was ambiguous, then a different situation arises, and the construction placed upon it by the agent, if it was warranted by the language of the policy, would be binding upon the company."

In Edwards vs. Masonic Mutual Life Assurance Assn., 86 W. Va. 339, 103 S. E. 454, 456 the court expressed its views very aptly in these words:

"The opinions in these cases are based upon the same principle which is invoked to sustain the plaintiff's right to recover here. The defendant insists that this

would change the contract, and that by its very terms no agent is allowed to make any representation which would change or alter it. The answer to this is that such a holding does not change the terms of the contract, but simply defines them. It cannot be doubted that the agents of insurance companies are presumed to have much more accurate and complete knowledge of the proper construction and effect of the policies issued by their principals than those with whom they deal, and that in any case in which the language can be susceptible of more than one meaning a representation made by the agent as to the correct meaning of it, and as to the meaning attributed to it by his company, justifies the insured in acting thereon."

\* \* \* \*

"An insurance company necessarily deals with the public through agents, and when an agent, authorized to solicit business for the company, makes a representation to one applying for insurance as to the meaning or effect given to certain language by the company, and such language is in any wise ambiguous, and such meaning is not inconsistent therewith, the company will not thereafter be allowed to say that such construction is not a proper one, when the insured has acted thereon in good faith."

Some discussion has been submitted both on the oral arguments of this case and in the briefs filed as to whether, when the loss occurred for which recovery is here sought, Mrs. Rose Johnstone was a guest of the Wilsons and a temporary member of their household. We are inclined to think under all the record discloses here, viewing the matter from a practical standpoint and applying the ordinary significance of language, that she was a temporary guest. Funk & Wagnalls New Standard Dictionary of the English language, defines "guest" to be:

"a person received and entertained at the house of another; a visitor; as, a welcome guest. The term is

applied with little respect to the duration of the call or visit and whether the person be present by invitation or not. The members of an evening party, persons invited to dinner, or relatives or friends making a long sojourn are alike guests."

Webster's New International Dictionary, Second Edition, defines the word "guest" thus: "A person entertained in ones house or at ones table; a visitor entertained without pay; hence a person to whom the hospitality of a home, club, etc., is extended."

So far as the right of recovery for the alleged loss is concerned, we hardly think it made any great difference whether she was or was not a guest. The District Court could find, it seems, that she had left her ring in the Wilson home when she was a temporary member of their household, that she was deprived of it by theft from that home and the company defendant had promised to pay for the loss but has not done so.

The decisions above cited when viewed in connection with the phraseology of the insurance contract aforesaid, the undisputed testimony quoted above and all the circumstances appearing in the case demonstrate, we think, that the judgment of the District Court was correct and should be affirmed.

*Affirmed.*

KIMBALL, J. and BLUME, J. concur.