No. 44,339

ALLIANCE MUTUAL CASUALTY COMPANY, *Appellant* and *Cross Appellee,* v. BOSTON INSURANCE COMPANY, *Appellee* and *Cross Appellant.*

(411 P. 2d 616)

Opinion filed March 5, 1966.

*Ward P. Ferguson,* of McPherson, argued the cause, and was on the brief for the appellant and cross appellee.

*Benjamin C. Langel,* of Wichita, argued the cause, and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Gerald Sawatzky, Donald L. Cordes, Robert L. Howard, Charles J. Woodin, Mikel L. Stout* and *Ronald K. Badger,* all of Wichita, were with him on the brief for the appellee and cross appellant. *John K. Bremyer* and *Dick R. Jones,* both of McPherson, *of counsel.*

The opinion of the court was delivered by

SCHROEDER, J.: This is a subrogation action between two insurance companies, and the plaintiff has perfected an appeal from the trial court's findings of fact and conclusions of law and the judgment rendered thereon for the defendant, and from other adverse rulings. A cross appeal has been filed by the defendant from an order overruling its motion to strike the notice of appeal and designation of contents of record on appeal.

The primary question is whether the trial court erred in holding that the accident in question did not arise out of the "ownership, maintenance or use" of an automobile as these terms are used in the defendant's automobile liability insurance policy.

The parties entered into a stipulation of facts, the pertinent por-

tions of which are that the plaintiff and defendant both insured the city of Coffeyville, Kansas, under separate and different liability insurance policies. Plaintiff's policy is commonly called a manufacturers' and contractors' liability policy and covered certain operations of the city. Defendant's policy is commonly called a basic automobile policy, the pertinent parts of which read:

"DECLARATIONS

. . . . . . . . . . . . .

"7. The purposes for which the automobile is to be used are 'pleasure and business,' unless otherwise stated herein: * * P & B & Commercial.

"8. Occupation . . . Municipality.

. . . . . . . . . . . . .

"Insuring Agreements

"I Coverage A—Bodily Injury Liability. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . caused by accident and arising out of the ownership, maintenance or use of the automobile.

"Coverage B—Property Damage Liability. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . caused by accident and arising out of the ownership, maintenance or use of the automobile.

. . . . . . . . . . . . .

"III Definition of Insured

"(a) With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the names insured . . . and also includes any person while using the automobile and any person or organization legally responsible for the use thereof. . . .

. . . . . . . . . . . . .

"IV. Automobile Defined . . .

"(a) Automobile. . . . the word 'automobile' means:

"(1) Described Automobile—the motor vehicle or trailer described in this policy;

. . . . . . . . . . . . .

"(e) Purposes of Use. . . . (2) The term 'commercial' is defined as use principally in the business occupation of the named insured as stated in the declarations, including occasional use for personal, pleasure, family and other business purposes. . . .

. . . . . . . . . . . . .

" 'REVISED' A324b AUTOMOBILE FLEET PLAN

. . . . . . . . . . . . .

"1. Definitions. The words 'owned automobile' shall mean a land motor vehicle, trailer or semitrailer owned by the named insured. . . .

"The following described equipment shall be deemed an automobile while towed by or carried on an automobile as above defined solely for purposes of transportation or while being operated solely for locomotion, but not otherwise: if of the non-crawler type, any power crane or shovel, ditch or trench

digger; and any air compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery. The word 'automobile' wherever used in the policy with respect to the insurance afforded under this endorsement, shall include 'owned automobile.' "

On November 16, 1962, one of the city's trucks, belonging to the electric department and described on defendant's policy, was dispatched with a crew and foreman to the intersection of First and Pine Streets in Coffeyville to straighten a light pole which was leaning heavily to the south and which was located on the south side of First Street.

The city truck was equipped with a power winch on which was a one-half inch steel cable. The winch was a permanent part of the truck; its power came from the truck motor and it was controlled by the truck driver by means of levers located in the cab of the truck. The drum and cable part of the winch was located in the bed of the truck directly behind the cab.

The foreman of the city work crew directed the driver to park the city truck on Pine Street north of First Street with the back of the truck towards the pole, which was across First Street to the south of the truck. The foreman then directed the driver to let out some cable from the truck winch, and this cable was then carried across First Street and attached to the pole about ten feet from the ground. By means of hand signals the foreman directed the driver to tighten the cable with the truck winch, and in this manner the leaning pole was pulled into a vertical position. When the pole was vertical the foreman signalled the driver to stop and to hold the pole in position with the winch and cable. This was done by the driver's putting the levers in the cab into "neutral" position with the motor of the truck running. This is the brake position of the winch. The driver stayed in the cab of the truck at all times. The truck winch and cable were then holding the pole in a vertical position.

The foreman then went over toward the pole, but before anything could be done to tamp the pole, a pickup truck being driven west on First Street by one Elmer Moon hit the cable. When this accident took place the cable was about four feet above the surface of First Street. It was unmarked and almost invisible to traffic. The foreman had neither put out flags, warning devices nor a man to warn traffic of this dangerous condition. The impact of the collision sheared off the top of the pickup cab even with its hood and

injured Elmer Moon, who was free from any negligence. The sole cause of the accident was the negligence of the city through its employees.

The plaintiff settled the claim of Elmer Moon without unnecessary delay after the defendant refused to do so, and this action was then brought.

After trial to the court without a jury on the stipulated facts, the court made findings of fact and conclusions of law that the accident arose from the negligent operations of the employees of the city of Coffeyville in straightening a utility pole by means of the use of a crane affixed to a truck owned by the city of Coffeyville, and said accident did not arise out of the "ownership, maintenance or use" of an automobile as these terms are used in the defendant's automobile liability insurance policy. Judgment was entered thereon in favor of the defendant and against the plaintiff.

The plaintiff moved the court to amend its findings, or make additional findings and to amend the judgment accordingly, or in the alternative for a new trial. This motion was overruled, after which the defendant orally moved that the words "winch and cable" be substituted for the word "crane" in the findings of fact and conclusions of law. The court sustained this motion.

The plaintiff appealed by filing a notice of appeal on April 14, 1965, and a designation of contents of record on appeal and statement of points on April 22, 1965. The plaintiff inadvertently left out the words "to the Supreme Court" in its notice of appeal, although they were in the designation of contents of record on appeal, and the defendant moved to strike the appeal on this technicality on April 27, 1965. The trial court overruled the defendant's motion to strike, and the defendant has cross-appealed from this order.

Turning to the cross appeal first, it may be said the trial court did not err in overruling defendant's motion to strike the appeal. It has been held when there is but one court to which an appeal can be taken, the omission to state the name of that court in the notice of appeal is not a ground for dismissal, but is an irregularity to be disregarded unless the appellee has been misled thereby. (*Russell v. State Highway Comm.*, 146 Kan. 634, 73 P. 2d 29.)

Another decision to the same effect is *Cooper v. Kansas City Public Ser. Co.*, 146 Kan. 961, 73 P. 2d 1092.

In the instant case there is but one court to which this appeal may

be taken, the Kansas Supreme Court. The defendant has not been misled in any manner by the inadvertent omission of the words "to the Supreme Court" in the plaintiff's notice of appeal. The designation of the contents of record on appeal shows the appeal is to the Supreme Court.

For a history of the appeal statute, now K. S. A. 60-2103, see 34 J. B. K. 20.

There is no basis upon which to interpret the new code strictly against previous Supreme Court decisions. The code itself shows that such was not the intent of the legislature. K. S. A. 60-102 reads:

"The provisions of this act shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding."

It is noted in Gard, Kansas Code of Civil Procedure Annotated, § 102, p. 2:

"The liberal construction provision has been placed here instead of in Article 2, as it is intended to apply to the entire code, not just the procedural rules. Thus it has a broader impact, as formerly, than does the similar provision on the federal level. . . ."

The code was not rewritten to make more technical and burdensome the requirements of the notice of appeal as construed by the Supreme Court in its previous decisions.

Did the accident in question arise out of the "ownership, maintenance or use" of an automobile as these terms are used in the defendant's automobile liability insurance policy?

On the construction of the term "use" an annotation in 89 A. L. R. 2d 163 begins with this statement:

"In a relatively few cases the word 'use' in an 'ownership, maintenance or use' clause has been given a specific construction, and it appears that the word 'use' is the general 'catch-all' of the insuring clause."

And in 7 Appleman, Insurance Law and Practice, § 4316, p. 142, it is stated:

"The term 'use' is the general catch-all of the insuring clause, designed and construed to include all proper uses of the vehicle not falling within one of the previous terms of definition. It is limited to the purpose for which the coverage is designed, namely, that the vehicle 1. Must be used for the purpose set forth in the declarations; 2. Must be pleasure or business, or commercial, as defined in the policy."

In *Esfeld Trucking, Inc., v. Metropolitan Insurance Co.,* 193 Kan. 7, 392 P. 2d 107, it was said:

"A detailed explanation of the definition of the word *use* appears in 91 C. J. S., Use, pp. 513, *et seq.,* and includes a statement to the effect that as a

noun *use* has been held to be synonymous with benefit and employment, and practically synonymous with enjoyment (p. 517), and as a verb, it has a well-understood meaning and a legal significance, having been variously defined as meaning to employ, to employ for any purpose, to employ for the attainment of some purpose or end, to avail one's self of, to convert to one's service, or to put to one's use or benefit, and the infinitive *to use* has also been defined as to hold, occupy, enjoy, or take the benefit of." (pp. 10, 11.)

The following cases have a bearing on the issue here presented.

In the case of *Great Amer. Ins. Co. v. Gen. Acc. Fire & Life Assur. Corp.*, 321 F. 2d 948 (5th Cir. 1963), the facts involved the use of a truck equipped with an A-frame and a winch and cable. With this truck a palm tree was hoisted and raised from the ground when it came in contact with a power line and injured an employee. There the court said:

". . . But in so concluding, we would emphasize at the outset that there can be no real question about the vehicle being 'used.' Much is said in the briefs about the extension of use by loading or unloading. That is not needed here. For here the purpose of the truck was to hoist the palm tree. Whether the palm was to be hoisted onto the bed of the truck and then transported some distance for transplanting, or whether, as seems more likely, it was simply hoisted sufficiently so that the truck could maneuver the tree to its new, but nearby, location is not revealed. But the truck was being used. More than that, it was that use of the truck which, in a physical, if not legal, sense brought about the accident. For the accident occurred when the palm fronds came in contact with the power line while the hoisting operation was going on. Consequently, it is unnecessary for us to make an *Erie*-Florida choice between the 'coming to rest,' or the 'completed operations' doctrine. . . ." (pp. 950, 951.)

Another federal case along the same line is *Employers Mut. Liability Ins. Co. of Wis. v. Maryland Cas. Co.*, 206 F. Supp. 589 (U. S. D. C. Miss. 1961), affirmed 307 F. 2d 510.

The foregoing cases are to be distinguished from the "separate machine" cases. While *Smedley v. Milwaukee Automobile Ins. Co.*, 12 Wis. (2d) 460, 107 N. W. 2d 625 (1961), was not on the construction of an insurance policy, but on the construction of a direct action statute, the question before the court was whether the operation and control of the crane at the time of the accident was the operation and control of a motor vehicle within the meaning of the statute. The facts disclosed a description of the machinery as follows:

"The hydraulic crane is mounted on a special base on a Mack truck chassis for the purpose of locomotion but when in use the unit is stationary. The crane has its own power separate from the motor of the truck and consists of

the hydraulic mechanism for lowering and raising a boom and its line. The boom is some 35 feet long and I beams are lifted by the process of placing a steel cable choker around the beam, fastening the choker to the hook of the line, and raising and swinging the boom. When used for this work the crane is stabilized and made immobile by the use of four outriggers on its platform." (p. 462.)

There the court held that the unit would be a motor vehicle when in locomotion, but since at the time of the accident the unit was stationary, the crane was stabilized, supported and rendered immobile by outriggers, the use of the unit when the accident occurred was not within the meaning of the negligent operation, management or control of a motor vehicle as used in the statute.

See, also, *Neumann v. Wisconsin Natural Gas Co.*, 27 Wis. (2d) 410, 134 N. W. 2d 474 (1965).

The doctrine announced in these "separate" machine cases is clearly contemplated in the defendant's policy of insurance when it defines "owned automobile." It is considered to be an "owned automobile" where the separate machine *is towed by or carried on* an automobile as defined in the policy *solely for purposes of transportation or while being operated solely for locomotion,* but not otherwise.

The facts in the instant case establish that this is not a "separate machine" case. Here the winch was part of the truck, using the truck motor, transmission, gears, etc. The winch was not an independent machine sitting on the truck. Cases hold where the separate machine causes an injury, when using the truck merely as a platform, it is not covered by the truck's liability insurance policy under the "ownership, maintenance or use" clause. Those cases have no application to the state of facts presently before the court.

Here the use of the city truck created a condition which was latent and dangerous to First Street traffic. The condition was the proximate cause of the personal injury and the property damage suffered by Elmer Moon. The condition was the unmarked and almost invisible cable stretched like a trap across the street from truck to pole. The condition was one arising from the use of the truck in raising and holding the pole.

The judgment of the lower court is reversed.