**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Appellant (Plaintiff below),**

v.

**FARMERS INSURANCE GROUP, a corporation; and Henry Wilcox and Cleve Martin, d/b/a Wilcox Oil Company, Appellees (Defendants below),**

**Laura H. Fields, Douglas Fields (Defendants below).**

No. 4684.

Supreme Court of Wyoming.

Oct. 5, 1977.

Richard W. Laugesen, Jr., DeMoulin, Anderson, Campbell and Laugesen, Denver, Colo., and Alfred M. Pence, Pence, Millett & MacMillan, Laramie, for appellant.

William H. Jackson, Rock Springs, and T. Michael Golden, MacPherson & Golden, Rawlins, for appellees.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

THOMAS, Justice.

This action was brought by State Farm Mutual Automobile Insurance Company, Appellant, seeking a declaratory judgment with respect to its obligations under a particular insurance policy. Laura H. Fields was the named insured in the policy and by definition Douglas Fields, her husband, also was included as a named insured. Appellant asked the district court to declare that it had no duty or liability under the insurance policy arising out of an accident which involved a self-propelled concrete pumping machine. The machine was owned by Douglas Fields. The district court ruled against appellant, holding that coverage under the insurance policy did include the accident described in the complaint. We do not agree with the construction of the critical language in the insurance policy by the district court, and the judgment must be reversed.

The concrete pumping machine was mounted on the chassis of a truck with single front wheels and dual rear wheels. In the center of the machine at the rear of the truck was a hopper which was designed to receive cement at a job site from a ready-mix cement truck. The concrete, through adjustments in the pumping mechanism, could be channeled along the ground level or it could be pumped upward through a pipe and then through a connecting hose which would carry it into an upper boom. The boom could be maneuvered in different directions so that the concrete could be poured into construction forms at varying positions and heights. The boom had a total extension of 67 feet.

The concrete pumping machine was equipped with four stabilizing feet or outriggers which were hydraulically controlled, and could lift the machine entirely off the ground. These were designed to furnish stability for the machine while it was pumping cement. The truck on which the cement pumping machine was mounted was mobile, and it could travel on the public roads from one construction site to another. It was licensed by the State of Wyoming. The only purpose of the machine was to pump concrete (usually delivered to the construction site by ready-mix cement trucks) into forms. It could by its own power be moved from place to place for that purpose. The machine was operated by means of a power takeoff which ran off the truck engine.

The accident which led to the filing of this action occurred on July 15, 1974. While the concrete pumping machine was in use at a construction site the boom was raised in order to pour concrete over an obstruction. While the boom was being maneuvered it came so close to an electrical power line that it attracted electrical energy which was transmitted to employees on the construction site, killing one employee and injuring two others. At that time the stabilizers were in use, and the machine was being operated at the construction site for the purpose of pumping concrete.

The concrete pumping machine and the truck on which it was mounted are not referred to in the insurance policy. This rig was acquired by Douglas Fields while the policy was in force, and the 30 day grace period for applying for coverage on newly acquired automobiles had not expired as of the date of the accident. If coverage were in effect it would be due to the policy provisions relating to newly acquired automobiles. The following policy language is pertinent in the disposition of this case:

"Owned motor vehicle—means the motor vehicle or trailer described in the declarations and includes a *temporary substitute automobile,* and *newly acquired automobile* * * *."

\* \* \* \* \* \*

"Newly acquired automobile—means an *automobile,* ownership of which is acquired by the named insured or his spouse, if a *resident* of the same household * * *."

\* \* \* \* \* \*

"Automobile—means a four wheel land motor vehicle designed for use principally upon public roads * * *."

The district court concluded that this was a newly acquired automobile within the

definition of the policy, and that the circumstances disclosed that the death and injuries came within the language of the policy providing coverage for those events which "were caused by accident arising out of the ownership, maintenance or use, including loading or unloading of the *owned motor vehicle*; * * *." This was the only significant conclusion by the district court in its judgment, and while the other appellees were made parties in the district court, the judgment dealt only with the efficacy of the insurance contract between appellant and the Fields.

Appellant argues for reversal contending that the policy did not afford automatic coverage to this concrete pumping machine and that the factual circumstances do not bring it within the omnibus liability clause of the policy. In addition, there is an argument that the liability insurance issued by the appellee, Farmers Insurance Group, should be applied to this particular accident. The district court made no determination with respect to this latter contention, and it therefore is not before us for purposes of this appeal. The parties agreed in the district court to the limited determination made with respect to coverage of the appellant's policy, and the appeal is limited to that judgment. The appellees, Laura H. Fields and Douglas Fields did not appear before our Court, and consequently we feel disadvantaged because the adversary system does not function effectively if both sides of the controversy are not represented. The appearance of the other appellees, Farmers Insurance Group, was merely for the purpose of insuring that the Court did not, in treating the appeal, go beyond the scope of the judgment actually entered by the district court.

The critical policy language is found in the definition of an automobile. We previously have recognized that parties to an insurance contract have the right to embody in their contract whatever lawful terms they wish and that the courts will not rewrite such contracts. *Alm v. Hartford Fire Insurance Company*, Wyo., 369 P.2d 216 (1962); *Rosenblum v. Sun Life Assur.*

*Co. of Canada*, 51 Wyo. 195, 65 P.2d 399, 109 A.L.R. 911 (1937). We are persuaded that at the time and place of the accident this concrete pumping machine was not "a four wheel land motor vehicle designed for use principally upon public roads * * *," and for that reason we hold that coverage did not exist under the appellant's policy.

Other courts have struggled with similar problems under a variety of circumstances involving various contractual provisions and different definitional phrases with a predictable assortment of results. Those courts which have dealt with factual circumstances most closely comparable to these have either directly or inferentially recognized a dual design concept. They have applied to devices such as that involved here a "Pegasus" principle. In a very pragmatic context they have held or indicated that while being driven from place to place a machine like this one is an automobile because under those circumstances it is like any other truck carrying any other load from one point to another. Conversely, they also have recognized that when set up in place to perform its primary function such a machine is no longer an automobile, but at that point and at that time it is being used for its other designed function. It then no longer is to be considered an automobile or motor vehicle under the definitional terms of the policy. *Sparkman v. Highway Insurance Company*, 266 F.Supp. 197 (W.D.La.1967); *Home Indemnity Company v. Transport Indemnity Company*, 263 Cal.App.2d 100, 69 Cal.Rptr. 504 (1968); *Industrial Indemnity Company v. General Insurance Company of America*, 210 Cal.App.2d 352, 26 Cal.Rptr. 568 (Cal. App.1962); *Schmidt v. Luchterhand*, 62 Wis.2d 125, 214 N.W.2d 393 (1974); *Smedley v. Milwaukee Automobile Insurance Co.*, 12 Wis.2d 460, 107 N.W.2d 625 (1961). Cf., *Liberty Mutual Insurance Company v. Dooley Electric Co., Inc.*, Sup., 133 N.Y.S.2d 785 (1954).

Under the reasoning of these cases this concrete pumping machine at the time and place of the accident which resulted in this action being brought, was not a four wheel land motor vehicle designed for use principally upon public roads. Instead, it was a

concrete pumping machine rendered immobile by the use of the outriggers or stabilizers, and it was at that time and that place principally designed and used only for the purpose of pumping concrete into forms. Since it was not included in the definitional language, it was not covered by the State Farm Mutual Automobile Insurance Company policy as a "newly acquired automobile."

While it is suggested that it is not unfair to include this machine within the coverage afforded it by the appellant's policy on the theory that it should have known the kinds of vehicles and equipment covered under its policy, this view overlooks the fact that appellant had no opportunity to consider this particular rig because coverage for it was sought under the newly acquired automobile definitions and no application for coverage had been submitted. A recognition of the dichotomy of use of a device such as this also recognizes a difference in the hazards arising out of the separate uses. The authorities indicate that premiums for automobiles and trucks are not established by including hazards such as the one which caused this accident.

Our disposition of the case on this basis makes it unnecessary for us to make any determination as to whether the accident arose out of the "loading or unloading" of a motor vehicle, which likewise would involve a vehicular use not present in this situation. Furthermore, the appellant has asked the court to determine the coverage of the comprehensive insurance policy of Farmers Insurance Group. As we have indicated above, this issue was not determined by the district court at the request of the parties. We therefore are unable to consider this question.

This case is reversed and remanded to the district court for the entry of judgment in accordance with the views expressed in this opinion.

ROSE, Justice, dissenting, with whom McCLINTOCK, Justice, joins.

I cannot concur in the decision of the majority reversing the holding of the district court.

In spite of its finding of non-coverage, the majority opinion, through its discussion of the "Pegasus" principle of dual design, has concluded that, while en route between construction sites, the vehicle herein would be considered a "motor vehicle" within the coverage of the insurance policy involved. The majority opinion then holds that, when the vehicle reaches its destination and is prepared for, and while in the course of, pumping operations, a change of character somehow magically occurs for insurance-coverage purposes and the vehicle is no longer a "motor vehicle," as contemplated by the policy.

State Farm makes the argument that a mobile cement-mixing truck—*mixing* away at the jobsite—*would be* an "automobile," properly described for coverage purposes as a

"four-wheel land motor vehicle designed for use principally upon public roads,"

and thus inside the policy, while a mobile cement-pumping-truck—*pumping* cement at the jobsite—*is not* such a vehicle and is therefore excluded. This nice differential evades me like a frisky little blue and grey butterfly at noonday in the summertime.

These whispy finite nuances of which such distinguishments are made have *always* been hard for me to capture. For my part, where these wafer-thin differences must be resolved in law in a way which will commit a court to come down either upon the side of the insurance company which drafted the imprecise wording—or the survivors of a deceased and the wife and children of the maimed—I have to say that I would ask the insurance company which accepts the premium, while denying liability, to draw for me a more vivid picture than State Farm has done in this case. Perception capable of capturing such a distinction as State Farm asks us to make between a mobile ready-mix-cement-machine and a mobile cement-pumping-machine would have been helpful to the solving of Alice's raven and the writing-desk riddle at the teaparty in Wonderland.

"The Hatter opened his eyes very wide on hearing this; but all he *said* was, 'Why is a raven like a writing-desk?'

" 'Come, we shall have some fun now!' thought Alice. 'I'm glad they've begun asking riddles.—I believe I can guess that' she added aloud.

" 'Do you mean that you think you can find out the answer to it?' said the March Hare.

" 'Exactly so,' said Alice.

" 'Then you should say what you mean,' the March Hare went on.

" 'I do,' Alice hastily replied; 'at least—at least I mean what I say—that's the same thing, you know.'

" 'Not the same thing a bit!' said the Hatter. 'Why, you might just as well say that "I see what I eat" is the same thing as "I eat what I see"!'

" 'You might just as well say,' added the March Hare, 'that "I like what I get" is the same thing as "I get what I like"!'

" 'You might just as well say,' added the Dormouse, who seemed to be talking in his sleep, 'that "I breathe when I sleep" is the same thing as "I sleep when I breathe"!'

" 'It *is* the same thing with you,' said the Hatter, and here the conversation dropped, and the party sat silent for a minute, while Alice thought over all she could remember about ravens and writing-desks, which wasn't much."

The bulk of the decisions cited by the majority opinion in support of its holding of non-coverage involve either insurance contracts with very specific exclusionary language concerning the definition of motor vehicle (*Sparkman v. Highway Ins. Co.*, 266 F.Supp. 197 (W.D.La.1967); *Home Indemnity Co. v. Transport Indemnity Co.*, 263 Cal. App.2d 100, 69 Cal.Rptr. 504 (1968); *Liberty Mutual Ins. Co. v. Dewey Electric Co., Inc.*, Sup., 133 N.Y.S.2d 785 (1954)), or situations in which the power source of the motor vehicle and machinery involved are separate (*Schmidt v. Luchterhand*, 62 Wis.2d 125, 214 N.W.2d 393 (1974); and *Smedley v. Milwaukee Automobile Ins. Co.*, 12 Wis.2d 460, 107 N.W.2d 625 (1961)).

The insurance policy with which this appeal is concerned defines within its coverage as an automobile, a "four wheel land motor vehicle designed for use principally upon public roads." It does not contain the extensive definitional exclusions as to the cases noted above and cited by the majority to bolster its view. In point of fact, it can be persuasively argued that heavy-duty, multi-purpose construction equipment was specifically contemplated as being within the policy coverage since the schedule of coverage and premium attached to the policy listed numerous items of construction equipment normally used in the masonry business. And this conclusion does not seem unique when it is noticed that such things as backhoe tractors and stake-body trucks have been construed to be "automobiles" within the context of the policy provision here for construction. *North River Ins. Co. v. Pomerantz*, Tex.Civ.App.1973, 492 S.W.2d 312 and *Continental Casualty Co. v. Buckeye Union Casualty Co.*, Ohio Com.Pl. (1957), 75 Ohio Law Abst. 79, 143 N.E.2d 169.

I am impressed with Judge Hamm's logic as he fashioned his district court opinion. Appellees attached to their appellate brief, as "Appendix 'A'," a photocopy of Judge Hamm's letter-opinion to the trial attorneys. Speaking of the use issue, Judge Hamm said:

".   .   . [I]t was still a newly acquired automobile. The policy, on Page 5, defines an automobile as a 'four wheel land motor vehicle designed for use principally upon public roads,   .   . .' The policy, on Page 3, provides coverage for injury 'caused by accident arising out of the maintenance or use, including loading or unloading, of the owned motor vehicle.' It is my conclusion—at least under the facts of this particular case—that 'automobile' and 'motor vehicle' are synonymous.

"Quite obviously, while the vehicle was moving along a public road from one site to another, it was a 'motor vehicle designed for use principally upon public roads.' As a matter of fact, while going

from site to site, it's sole function was for use principally on public roads, and had an accident occurred in transit from one site to another, I have no doubt of coverage. *Smedley v. Milwaukee Automobile Ins. Co.*, 12 Wis.2d 460, 107 N.W.2d 625, 628.

"Having arrived at the work site, does the characterization of the vehicle as an automobile change? It served in the dual capacity of transport vehicle and as a cement pumper. The policy provides coverage, as noted, for injury 'caused by accident arising out of the . . . use, including loading and unloading . .' Certainly the automobile was being used in that its engine provided the power for the cement pumper through the power take off. Presumably, also, the truck engine was used to activate the stabilizers and to move the nozzle. Counsel for plaintiff has cited well reasoned Wisconsin cases concerning a crane, a sewer cleaning machine, a backhoe, and a hoist, each of which deny coverage. However, in each case, the Court specifically pointed out the nature of the power source.

"In *Smedley v. Milwaukee Automobile Ins. Co.*, 626, supra, the Court said:

"'The crane has its own power separate from the motor of the truck. . . .'

"In *Norton v. Huisman*, 17 Wis.2d 296, 116 N.W.2d 169, 170, involving a sewer cleaning machine, it was said: ·

"'The unit was a self-contained unit and was not dependent for its operation upon any outside power source or controls, nor did it depend for its operation, while operating, upon its ability to move forward or backward.'

"'When the machine is thus located at the manhole, the truck is stopped and its motor is turned off, and it thereafter serves only as a platform to support the sewer cleaning machine while such machine operates as an independent immobile unit.'

"*Neumann v. Wisconsin Natural Gas Co.*, 27 Wis.2d 410, 134 N.W.2d 474, concerned:

"'. . . a Hy-Hoe excavator mounted on a special base on the chassis. The "Hy-Hoe" unit was completely self-powered by means of a hydraulic mechanism which operated the scoop. The truck was used merely for transportation and was shut off once the unit was in proper position at a job site.'

"The latest of the above cases was *Schmidt v. Luchterhand*, 62 Wis.2d 125, 214 N.W.2d 393, which specifically pointed out that in each of the above cases, the power source was independent of the vehicle itself. In *Schmidt*, at Page 395, the Court said:

"'The boom of the hoist is raised by means of hydraulic power supplied by a compression unit with a 12-volt car starter and centrifugal pump. The starter for the compression unit derives its power from the truck battery. The operator stands on the bed of the truck and presses the starter and this raises the boom to the desired position by means of hydraulic fluid. Once the boom has been raised to its desired position the starter is released and there is no more electrical energy or any source of mechanical energy provided by the truck. The very limited use of the truck's battery is the only connection the hoist has with the truck unit. With the boom extended, objects (trusses) can be moved by use of a winch and cable apparatus which is operated entirely by hand.'

"'Luchterhand had turned off the engine of his truck some two or three hours before the accident occurred. The work of raising the trusses was accomplished by means of manually operating the hoist.'

"And on Page 399:

"'Also, we do not place a great significance on the fact that the boom of the hoist was initially raised into position by power derived in part from the battery of the truck. The truck battery was used *only initially* to activate the hydraulic equipment to raise the

boom of the hoist. The hoist had been in place for over two hours before the accident.'

" '. . . such incidental use of the truck battery does not bring the hoist within the use of the automobile provisions of the . . . insurance contract.'

"The emphasis in the last quote above was supplied by the Wisconsin Court, which fact, coupled with the fact that the Court made specific reference to the power sources in each case it cited, leads me to believe that it deemed such power source important, and to further believe that had that power source been as in this case, the Wisconsin Court would have found that the injury arose out of the 'use' of the automobile. Numerous cases have found that an automobile was being used as such under less compelling circumstances than above. For example, the 10th Circuit, in *Unigard Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 466 F.2d 865, held that the handing of an unloaded rifle to another person from the back of a stopped truck arose out of the use of the vehicle. Long, Law of Liability Insurance, Volume I, Sect. 1.22, Page 1–59, considered the decision 'incredible' and stated that if it were not the law, 'the absurdity of it would be apparent.' However, Long, in the same section, on Page 1–56 seems to believe that an attack with a tire iron by a cab driver upon a passenger after they had stopped and gotten out of the cab was covered as an injury 'sustained by any person . . . caused by accident and arising out of the . . . use of the automobile.' The 5th Circuit, in *Fidelity and Casualty Company of New York v. Lott*, 273 F.2d 500, held that using a parked car as a rifle rest constituted 'use' of the car within the meaning of the policy."

I would subscribe to Judge Hamm's reasoning and observe that a finding of "use" here is not at all remote considering the even less-convincing factual bases upon which "use" has been found in still other authority not referred to by the judge. See Annotation, Automobile Liability Ins.—

Risks, § 9; 89 A.L.R.2d 150, 163; *Wyoming Farm Bureau Mutual Ins. Co. v. State Farm Mutual Auto Ins. Co.*, 10 Cir., 1972, 467 F.2d 990 (throwing of empty vodka bottle from vehicle a "use"); *Alliance Mutual Casualty Co. v. Boston Ins. Co.*, 196 Kan. 323, 411 P.2d 616 (1966) (extending steel cable from utility pole to winch of truck a "use"); *Travelers Ins. Co. v. Aetna Casualty and Surety Co.*, Tenn.1973, 491 S.W.2d 363 (discharge of shotgun being placed in vehicle a "use"). ·

Concerning the "use" issue, Judge Hamm said:

". . . I must conclude that the accident arose out of the use of the vehicle. . . ."

## LOADING AND UNLOADING

Judge Hamm went on to say in his letter opinion:

"However, I need not stop there. The policy also provides for coverage for accidental injury 'arising out of . . . loading and unloading.' Long, Law of Liability Insurance, Volume I, Section 6.01, Page 6–2 states:

" 'The question in all cases involving this provision may be stated: Did the accident occur in the course of loading and unloading the vehicle? In considering this question it should constantly be held in mind that the policy was written to cover the . . . use of a vehicle transporting goods and that assumption of risk during the loading and unloading was written into the policy as an extension of the "use" coverage. Coverage should not be extended to accidents which are not causally related to the use and loading or unloading of the vehicle; that is to say, there must be a causal relation between the use of an insured truck and the accident for which damages are demanded.' "

"And at Section 6.02, Page 6–3:

" 'The words "loading and unloading" were intended . . . to cover liability when the truck was stationary,

otherwise the phrase is meaningless. When loading begins and unloading ends is not always easily determined.'

" 'The intent of the provision is to afford coverage whenever an accident results from loading or unloading of a vehicle. There must be a causal relation between the injury and the process of unloading the vehicle.'

"Long then cites several cases concerning loading and unloading, in one of which a coal truck had unloaded its coal on the sidewalk and driven away, and a pedestrian stumbled over a piece of coal. The Court found a causal relation between the use of the truck and the accident. *Maryland Casualty Co. v. Cassetty Coal Co.*, 6 Cir., 119 F.2d 602. He cites other cases with similar holdings, and others opposite. The distinction seems to lie in whether or not the goods being unloaded have 'come to rest,' or the 'operation has been completed.' Although Long states the two theories are disharmonious, I do not find that that disharmony is material here. The GMC in this case was, at the time of the accident, being, or had been, loaded with cement by a cement truck, and was in the process of pumping that cement into the construction forms. Whether it was actually pumping at the time the pumper touched the power line, I do not know, but consider that immaterial because at the time of the accident it was in constant operation either loading or unloading cement, or both simultaneously, and either moving the nozzle of the pumper at the same time, or had stopped pumping momentarily to reposition the nozzle. Whatever the situation, it seems to me that it was all part of a continuing operation, and that nothing had come to rest nor was there a completed operation. Accordingly, I must also find that the automobile was also in the process of loading and unloading, as an extension of the other use to which it was being put in supplying power for the pumper. The loading and unloading of the truck was a necessary incident to its use, regardless of how such loading and unloading was accomplished."

Any ambiguity which might arise concerning such coverage should not place the risk of misinterpretation on the insured since ambiguity in an insurance contract is to be construed liberally in favor of the insured and strictly against the insurer. *Wyoming Farm Bureau Mutual Ins. Co. v. State Farm Mutual Auto Ins. Co.*, 10 Cir. 1972, 467 F.2d 990; *Wilson v. Hawkeye Casualty Co.*, 67 Wyo. 141, 215 P.2d 867 (1950).

Under the circumstances of this case, I would hold the district court's decision finding the "vehicle" in question herein to be within the contemplated insurance coverage should be affirmed.