No. 67,266

ASHRAF HAMIDIAN and THE ESTATE OF SAED B. RAZIZADEH, by and through the Executor, SEID RAZIZADEH, *Appellants*, v. STATE FARM FIRE & CASUALTY COMPANY, an Illinois corporation, *Appellee*.

(833 P.2d 1007)

Opinion filed May 22, 1992.

*Gregory M. Dennis*, of Perry & Hamill, of Overland Park, argued the cause, and *Thomas L. Thurston*, of the same firm, was with him on the briefs for appellants.

*Michael J. Dutton*, of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, J.: This is an action upon an automobile insurance policy seeking recovery of uninsured motorist and personal injury protection (PIP) benefits. The district court entered summary judgment in favor of the defendant insurance company on the grounds that the complained-of injuries and death did not arise out of the ownership, operation, maintenance, or use of a motor vehicle. The plaintiffs appeal therefrom.

The undisputed tragic facts may be summarized as follows. On January 25, 1989, Saed Razizadeh drove his 1985 Oldsmobile to the Midland Theatre to see the musical "Cats." He was accompanied by his mother, Ashraf Hamidian; his brother, Seid Razizadeh; and his brother's girlfriend, Susanne Muller. After the

musical ended, Saed, accompanied by the other three members of his party, started the drive back to his Overland Park home. While driving on Shawnee Mission Parkway near Canteberry Road, Saed's vehicle was bumped lightly from the rear by another vehicle. Saed stopped his vehicle, as did the bumping motorist. Saed walked to the back of his vehicle to look for damage. The other driver, an unknown man, walked over to Saed, pulled a gun, and shot Saed twice in the chest. Mrs. Hamidian left the vehicle and started to go to her fallen son. She observed the man taking money and a wallet from Saed's pocket. As Mrs. Hamidian approached the pair, the man shot her twice, once in each arm. The man then fled the scene in his automobile. Saed died from the gunshot wounds.

Phillip D. Mack was arrested and charged with three felonies arising from the incident (Johnson County District Court Case No. K-63467).

Saed's Oldsmobile was insured by State Farm Fire and Casualty Automobile Insurance Company, which included uninsured motorist coverage and PIP benefits under the no-fault coverage. The action herein was commenced by Mrs. Hamidian and Seid Razizadeh as executor for the estate of Saed seeking recovery under the policy.

For their first issue on appeal, plaintiffs contend the district court erred in holding that the injuries to Mrs. Hamidian and the death of Saed did not arise out of the use, operation, maintenance, or ownership of a motor vehicle and, accordingly, the State Farm policy provided neither uninsured motorist coverage nor PIP benefits.

The pertinent policy provisions are as follows:

"SECTION II—NO-FAULT—COVERAGE P

. . . .

"We will pay in accordance with the *No-Fault Act* for *bodily injury* to an *insured*, caused by accident resulting from the ownership, maintenance or use of a *motor vehicle*, benefits for:

. . . .

*Insured*—means:
  1. *you* or any *relative*:
    a. while *occupying* a *motor vehicle*; or
    b. struck as a *pedestrian* by a *motor vehicle*.
    . . . .

2. any other *person* while *occupying* or struck as a *pedestrian* by a *motor vehicle* insured under the liability and no-fault coverages of this policy. . . ."

. . . .

"SECTION III—UNINSURED MOTOR VEHICLE—COVERAGE U

. . . .

"We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *uninsured motor vehicle*. The *bodily injury* must be caused by accident arising out of the operation, maintenance or use of an *uninsured motor vehicle*.

*Uninsured Motor Vehicle*—means:

1. an *'uninsured'* land motor vehicle, the ownership, maintenance or use of which is:

    a. not insured or bonded for bodily injury liability at the time of the accident; or

    b. insured or bonded for bodily injury liability at the time of the accident; but the insuring company denies coverage or is or becomes insolvent; or

. . . .

3. a 'hit-and-run' land motor vehicle whose owner or driver remains unknown and which strikes:

    a. the *insured* or

    b. the vehicle the insured is *occupying* and causes *bodily injury* to the *insured*; or

4. a. 'phantom' land motor vehicle:

    a. whose owner or driver remain unknown;

    b. that causes *bodily injury* to the *insured*; and

    c. that does not strike either the *insured* or the vehicle the *insured* is *occupying*."

The policy defines the term "occupying" as follows:

"*Occupying*—means in, on, entering or alighting from."

There is no claim herein that the policy provisions unduly restrict or dilute the statutory requirements for no-fault coverage (K.S.A. 40-3107) or uninsured motorist coverage (K.S.A. 1991 Supp. 40-284), and, accordingly, further reference to said statutes is unnecessary.

In determining whether the injuries arose out of the use, maintenance, or operation of a motor vehicle under the uninsured motorist policy provision, the focus is on the Mack vehicle. In determining whether the injuries arose out of the ownership, maintenance, or use of a motor vehicle under the no-fault coverage, the focus is on Saed's Oldsmobile. However, for our purposes, we really need not separately discuss the vehicles. The

Mack vehicle bumped Saed's vehicle. The defendant insurance company characterizes the incident as a bump-and-run robbery. The *modus operandi* of this type of offense is for the robber to bump the chosen vehicle in order to get the driver to stop and leave his or her vehicle so that robbery may be committed. One could infer that this was what occurred herein, but the district court did not do so.

At the time of the shootings, both vehicles were stopped and driverless. Both drivers were standing behind Saed's vehicle when Mack pulled his gun and shot Saed. Mack was robbing the fallen Saed when Saed's mother was approaching the pair and was, in turn, shot. Neither vehicle was the instrument causing the injuries or being operated at the time of the injuries.

Plaintiffs argue that coverage is afforded because the bump or collision between the two vehicles was the reason Saed stopped his automobile, got out, and walked to the rear to inspect possible damage thereto. They also point out that under Kansas law, a driver is required to stop after being involved in a personal injury or property damage producing accident (K.S.A. 8-1602 and K.S.A. 8-1603) and give certain information (K.S.A. 8-1604). Plaintiffs argue these statutes bring the injuries into the ambit of arising from the use, ownership, maintenance, or operation of a motor vehicle. We do not agree.

What is entailed in the "use" of a motor vehicle was discussed extensively in *Esfeld Trucking, Inc. v. Metropolitan Insurance Co.*, 193 Kan. 7, 392 P.2d 107 (1964). Aside from the fact *Esfeld* resulted in a 2-2-2 decision, the facts of the case and its posture before this court render it of little assistance herein. A semi-trailer truck, which had formerly been loaded with pipe, was being winched into position close to an oil well by a Caterpillar tractor. In the process, a geologist was run over by the semi-trailer truck. The semi's owner and the Caterpillar's owner each settled with the injured geologist. In the subrogation action before us, the question was whether the Caterpillar's insurer should be indemnified by the semi's insurer. The semi's policy included in its "Definition of Insured" the following:

"'. . . and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the

actual use of the automobile is by the named insured or such spouse or with the permission of either.' " 193 Kan. at 10.

The question became whether or not the winching of the vehicle was use of the vehicle by the Caterpillar's owner.

In discussing the matter this court stated:

"A detailed explanation of the definition of the word *use* appears in 91 C.J.S., Use, pp. 513, *et seq.*, and includes a statement to the effect that as a noun *use* has been held to be synonymous with benefit and employment, and practically synonymous with enjoyment (p. 517), and as a verb, it has a well-understood meaning and a legal significance, having been variously defined as meaning to employ, to employ for any purpose, to employ for the attainment of some purpose or end, to avail one's self of, to convert to one's service, or to put to one's use or benefit, and the infinitive *to use* has also been defined as to hold, occupy, enjoy, or take the benefit of. (pp. 518-519.)

"In determining the coverage of a policy such as our present one a court must consider whether the injury sustained was a natural and reasonable incident or consequence of the *use* of the vehicle involved for the purposes shown by the declarations of the policy though not foreseen or expected. It has been held that one who entered an automobile of another in order to move it a short distance so as to enable him to park his own automobile was *using* such car when the car rolled into a third car, causing injuries thereto, because the dictionary definition of *use* includes *to put into operation.* (7 Am. Jur. 2d, Automobile Insurance, § 82, and note 2 thereunder, p. 387.)" 193 Kan. at 10-11.

This court then held that the semi-trailer's insurer did not have to indemnify the Caterpillar's insurer; however, the court emphasized that the case did not involve the rights of an injured party but was merely a dispute between insurers.

The Court of Appeals has decided a series of cases at least somewhat more closely related to the issues herein. In *United States Fidelity & Guar. Co. v. Farm Bureau Mut. Ins. Co.*, 2 Kan. App. 2d 580, 584 P.2d 1264 (1978), the driver and two other persons were riding in the front seat of an automobile. The passenger in the middle grabbed the steering wheel and caused the vehicle to be wrecked. The other passenger sued both occupants. The question became whether the driver's or the middle passenger's insurer was liable. The Court of Appeals concluded the middle passenger had exerted control over the vehicle and was thereby using it, and that her insurer was therefore liable.

Of more relevance is *Farm Bureau Mut. Ins. Co. v. Evans*, 7 Kan. App. 2d 60, 637 P.2d 491 (1981), *rev. denied* 231 Kan. 800 (1982). In *Evans*, defendants were using the back of a station wagon as a seat during an outdoor party. One of the defendants threw a firecracker out of the automobile and into the beverage a woman was drinking, and she was injured. She sought damages under the vehicle owner's automobile liability insurance policy. In holding against her, the Court of Appeals reasoned as follows:

"The policy provision in question is mandated by the legislature. K.S.A. 1980 Supp. 40-3107(b). As an automobile liability coverage clause, it is to be interpreted broadly to afford the greatest possible protection to the insured. *United States Fidelity & Guar. Co. v. Farm Bureau Mut. Ins. Co.*, 2 Kan. App. 2d 580, 584 P.2d 1264 (1978). In the case before us, the trial court found the vehicle was being 'used' within the meaning of the coverage clause because of its use as a shelter. But mere use of a vehicle, standing alone, is not sufficient to trigger coverage. Thus, even though the vehicle was being used within the meaning of the automobile liability policies, the question remains whether that use is so remote from the negligent act that it can be said there was no causal relationship between the use of the car and the injuries sustained.

"Kansas has construed the word 'use' in connection with automobile liability policies on three occasions: *Alliance Mutual Casualty Co. v. Boston Insurance Co.*, 196 Kan. 323, 411 P.2d 616 (1966); *Esfeld Trucking, Inc. v. Metropolitan Insurance Co.*, 193 Kan. 7, 392 P.2d 107 (1964); *United States Fidelity & Guar. Co. v. Farm Bureau Mut. Ins. Co.*, 2 Kan. App. 2d 580. None of these cases is exactly on point, but language found in *Esfeld* indicates Kansas follows the majority rule that there must be some causal connection between the use of the insured vehicle and the injury. In *Esfeld*, the court stated:

" 'In determining the coverage of a policy such as our present one a court must consider whether the injury sustained was a natural and reasonable incident or consequence of the *use* of the vehicle involved for the purposes shown by the declarations of the policy though not foreseen or expected.' 193 Kan. at 11.

"The general rule in other jurisdictions is that 'arising out of the use' of a vehicle requires the finding of some causal connection or relation between the use of the vehicle and the injury. *E.g.*, *Richland Knox Mutual Insurance Company v. Kallen*, 376 F.2d 360 (6th Cir. 1967); *Government Employees Insurance Company v. Melton*, 357 F. Supp. 416 (D.S.C. 1972), *aff'd in unpublished opinion*, 473 F.2d 909 (1973); *Mazon v. Farmers Insurance Exchange*, 107 Ariz. 601, 491 P.2d 455 (1972); *Speziale v. Kohnke*, 194 So. 2d 485 (La. App. 1967); *National Family Ins. Co. v. Boyer*, 269 N.W.2d 10 (Minn. 1978); 7 Am. Jur. 2d, Automobile Insurance § 194, p. 703; Annot., 89 A.L.R.2d 150, 153; 8 Blashfield, Automobile Law & Practice § 317.1,

p. 5; 12 Couch on Insurance 2d § 45:56. Stated another way, an injury does not arise out of the 'use' of a vehicle within the meaning of the coverage clause of an automobile liability policy if it is caused by some intervening cause not identifiable with normal ownership, maintenance and use of the insured vehicle and the injury complained of. *Kangas v. Aetna Casualty Co.*, 64 Mich. App. 1, 235 N.W.2d 42 (1975); *Norgaard v. Nodak Mutual Insurance Company*, 201 N.W.2d 871 (N.D. 1972); *Plaxco v. U.S. Fidelity & Guaranty Co.*, 252 S.C. 437, 166 S.E.2d 799 (1969); *State Farm Ins. v. Centennial Ins.*, 14 Wash. App. 541, 543 P.2d 645 (1975). The provision, however, imparts a more liberal concept of a causation than 'proximate cause' in its traditional, legal sense. *Watson v. Watson*, 326 So. 2d 48 (Fla. Dist. Ct. App. 1976); *Dairyland Insurance Co. v. Concrete Products Co.*, 203 N.W.2d 558 (Iowa 1973); *Shinabarger v. Citizens Ins. Co.*, 90 Mich. App. 307, 282 N.W.2d 301 (1979); *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13 (Mo. App. 1980); *State Farm Ins. v. Centennial Ins.*, 14 Wash. App. 541; 7 Am. Jur. 2d, Automobile Insurance § 194, p. 703; 8 Blashfield, Automobile Law & Practice § 317.1, pp. 5-6; 12 Couch on Insurance 2d § 45:56, p. 147.

"We need not decide whether a different result might be reached if the vehicle had been in motion at the time. Some courts have held that if a vehicle is moving and the speed of the car contributed to the impact of a thrown missile, such would be a sufficient causal connection. Likewise, the mere throwing of the contents of an ashtray or other trash normally found in a vehicle could constitute a use. The throwing of an explosive device from a car, however, has generally been held to be so remotely connected with the use of the vehicle that it is not causally related to the injury. *Kraus v. Allstate Insurance Company*, 379 F.2d 443 (3rd Cir. 1967); *Wirth v. Maryland Casualty Company*, 368 F. Supp. 789 (W.D. Ky. 1973), *aff'd in unpublished opinion*, 497 F.2d 925 (1974); *McDonald v. Great American Insurance Company*, 224 F. Supp. 369 (D.R.I. 1963); *Speziale v. Kohnke*, 194 So. 2d 485.

"The use of the Roses' vehicle did not causally contribute to Karen's injuries anymore than it would have if one of the occupants, under the facts present in this case, had shot her with a firearm. The fact that the M-80 was lit inside the vehicle and the defendants might have had difficulty lighting it *if* no shelter had been available is so remote that it does not furnish the necessary causal relationship between the use of the car and her injuries. We see no more difference in the use of the vehicle here under the facts present than if the owner of the vehicle had been outside the car and in order to avoid the rain had held the device under the car or stood on the 'leeward' side of it to light the device." 7 Kan. App. 2d at 62-64.

*Allied Mut. Ins. Co. v. Patrick*, 16 Kan. App. 2d 26, 819 P.2d 1233 (1991), involved a claim under an automobile liability policy based upon a boy having been sexually molested in the insured

vehicle. The insureds had been sued by the injured party and the insureds demanded that their insurer defend the action and indemnify them. The Court of Appeals held in favor of the insurance company, stating:

"An incident resulting in injury is not an 'automobile accident' merely because it occurs in an automobile; there must be some causal relationship between the incident and the automobile involved." Syl. ¶ 2.

"For an automobile insurer to be liable for an automobile accident, unless the express language of an insurance policy provides otherwise, the automobile must, in some manner, be involved in the accident, and the mere fact that an accident takes place in or near the automobile does not impose responsibility upon the insurer." Syl. ¶ 3.

While Kansas has no reported decisions involving bump-and-run robberies or similar factual situations, other jurisdiction have such decisions. In *Byrne v. State Farm Ins. Co.*, 572 So. 2d 728 (La. App. 1990), an insured brought an action against the insurer to recover under uninsured motorist provisions of an automobile liability policy for injuries received in a bump-and-run robbery. After the insured stopped and exited therefrom to inspect her car, the insured's purse was stolen and she was struck in the face.

The insurance policy in question provided:

" 'We will pay damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle. The bodily injury must be caused by an accident arising out of the operation, maintenance or use of an uninsured motor vehicle.' " 572 So. 2d at 729.

The Louisiana Court of Appeals held that the policy did not cover the injury:

"We find that the uninsured motor vehicle had ceased being 'used' at the time of the plaintiff's injury. There was no continuous flow connecting the use of the automobile to the subsequent injury because the plaintiff had ended her relationship with the vehicle when she had turned off the engine, locked her door and exited the car. The plaintiff did not sustain any physical injuries in connection with the actual operation of her car. We feel that injuries complained of were too remote to have arisen out of the use of the vehicle." 572 So. 2d at 730.

For other cases reaching similar results see, *e.g.*, *Race v. Nationwide Mut. Fire Ins. Co.*, 542 So. 2d 347 (Fla. 1989); *Day v. State Farm Mut. Ins. Co.*, 261 Pa. Super. 216, 396 A.2d 3 (1978).

The opposite result was reached in Rhode Island in *General Acc. Ins. Co. of America v. Olivier*, 574 A.2d 1240 (R.I. 1990). An automobile accident occurred. Police were summoned and while they were investigating the accident, Olivier, a passenger of one vehicle, was asked to sit in a police car 100 feet away. As she approached the police vehicle, the driver of the other vehicle involved in the accident shot and killed her. Uninsured motorist coverage and medical payment provisions were held applicable. Although acknowledging that many other courts had held otherwise in similar circumstances, the Supreme Court of Rhode Island found there was a sufficient nexus between occupancy of the vehicle and the injury.

In the case before us, the trial court held:

"D. Based upon the facts set forth above and the authorities set forth in defendant's memorandum in support of its motion for summary judgment, the Court finds as a matter of law that the death of Saed Razizadeh and the injuries of plaintiff Ashraf Hamidian were caused by and a result of gunshot wounds and were not caused by, nor did they arise out of, the ownership, operation, maintenance or use of a motor vehicle.

"E. The Court finds that defendant's policy of insurance provides no coverage for the plaintiffs' death or injuries because the death and injuries *did not arise out of the ownership, operation, maintenance or use of a motor vehicle.*"

We agree with the trial court.

Viewing the facts from the uninsured motorist aspect of the claim, all drivers would be uninsured motorists as no automobile liability policy would insure for the activities herein. The shootings were intentional acts unrelated to the operation of a motor vehicle. If the incident herein was a bump-and-run robbery, the vehicle was used only to get the driver to stop. Throwing a rock, putting up a street barrier, or placing nails in the road could all have served the same purpose. If the minor accident was not part of a planned robbery, then the shootings have even less connection to the injuries. Under either circumstances the Mack vehicle's involvement was merely incidental to the death and injury and was not the cause thereof. The injuries did not result from an automobile accident and do not arise from the operation, maintenance, or use of the uninsured vehicle.

As for PIP benefits under the no-fault coverage, the injuries did not result from the ownership, maintenance, or use of Saed's vehicle. The injury and death occurred at a time when the insured's vehicle was not being operated, the victims were not occupying the vehicle, and the vehicle was not involved in the infliction of their injuries. The ownership, use, or maintenance of the vehicle must have a greater nexus to the injury than just relating to a party being in the wrong place at the wrong time and thereby becoming the victim of intentional violence.

The judgment is affirmed.

ABBOTT, J., not participating.