**Lawrence M. ULRICH, Appellant (Plaintiff),**

v.

**UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellee (Defendant).**

No. 92–6.

Supreme Court of Wyoming.

Oct. 8, 1992.

---

William R. Fix of Fix & Mulligan, Jackson, for appellant.

Richard P. Boley and Peter K. Michael of Boley & McKellar, P.C., Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT* and GOLDEN, JJ.

GOLDEN, Justice.

Lawrence B. Ulrich (Ulrich) filed a complaint against his automobile insurance carrier, United Services Automobile Association (USAA), seeking a declaration that the uninsured motorist (UM) provision of his liability policy provided coverage for injuries he sustained in a parking lot shootout. After a hearing on cross-motions for summary judgment, the district court determined that Ulrich's injuries did not "arise out of the ownership, maintenance or use of the uninsured motor vehicle," as required by Ulrich's USAA policy. The district court accordingly issued an order

---

*Chief Justice at time of oral argument.

which granted to USAA its motion for summary judgment. Ulrich appeals from the district court's order. We will affirm.

## ISSUES

Ulrich presents the following issue for our review:

I. Do genuine issues of material fact exist as to whether appellant's injuries arose out of the "ownership, maintenance or use" of the uninsured motor vehicle precluding the entry of summary judgment?

USAA restates the issue in this manner: Whether the intentional shooting of an insured by an uninsured motorist in a parking lot can be said to arise out of the assailant's use of his uninsured motor vehicle.

## FACTS

The facts of this case, drafted in the light most favorable to Ulrich, are as follows: On July 29, 1989, Ulrich and an acquaintance, Glenn Hildebrant, were drinking at the Cowboy Bar in Pinedale, Wyoming. While at the bar, Ulrich became upset with the unlady-like conduct of a bar patron, Kemo. Ulrich reproved Kemo for her conduct and a verbal confrontation ensued.

Kemo and her companion, Gus Stallings, left the bar shortly after the verbal confrontation. Ulrich dismissed the whole situation as mere "bar talk" and did not expect anything further to develop. However, when Ulrich and Hildebrant left the bar, Kemo approached shouting obscenities and began "putting a hurt on" Ulrich. Ulrich attempted to repel the attack by pushing Kemo aside, but was unsuccessful. The altercation continued, both combatants being egged-on by their sidekicks. Stallings then joined the assault by "sucker-punching" Ulrich a couple times from behind. Stallings' conduct so enraged Hildebrant that he intervened and proceeded to put "a whipp'n" on Stallings. At approximately this point in the melee, a bystander yelled "Hey, the cops are coming." The members of the crowd that had gathered "scattered like rats," and the fight came to an abrupt end. All parties to the fracas apparently walked away without incident.

Two weeks later, on August 12, 1989, Ulrich again found himself in the Cowboy Bar, this time accompanied by Darrin Hill. Ulrich and Hill had just attended a Little Britches' Rodeo and had stopped for a few beers before returning home. While at the bar, two fellows dressed in white and wearing fruit baskets on their heads invited Ulrich and Hill to a private toga party. Ulrich and Hill subsequently left the bar in Ulrich's Bronco. Hill was driving as he knew where the toga party was being held. While on the way, Hill decided to stop at the Trailside Convenience Store to purchase some cigarettes. He parked Ulrich's Bronco between the front entrance of the store and the gas pumps. Hill then went into the store for his cigarettes, and Ulrich exited the Bronco to put some air in the right front tire.

As Ulrich was putting air in his tire, a Toyota pickup with a camper shell pulled directly in front of and perpendicular to Ulrich's Bronco. The Toyota was positioned so as to block the Bronco's means of forward egress. Ulrich glanced upward and instantly recognized the occupants of the Toyota as Stallings and Kemo. Stallings immediately began yelling at Ulrich about the Cowboy Bar incident, stating he intended to get even. Ulrich countered by informing Stallings that he had no "beef" with him and, nicely put, by directing him to move his truck. Hill exited the Trailside as this exchange was in progress. Believing that the controversy was over the parking location of Stallings' truck, Hill also chimed in with his two cents worth. Stalling became enraged upon seeing Hill, who he mistakenly believed to be Hildebrant, and continued his threats to get even.

Ulrich and Hill then jumped into the Bronco. Somewhat confused, Hill excitedly asked "What's going on?" Ulrich explained, "He [Stallings] thinks you are Glenn [Hildebrant], the guy that beat him up a couple weeks ago at the fight." As Hill looked up after starting the Bronco, he noticed that Stallings' truck was no longer

blocking the way. In an attempt to get a better angle, Stallings had backed up and pulled parallel to the Bronco. Only the gas pumps separated the vehicles which, although parallel, were facing opposite directions. Stallings was leaning over his passenger, Kemo, and was pointing the business end of a chrome plated handgun at Hill and Ulrich. Stricken with fear, Ulrich shouted, "We don't want no trouble. Don't be a fool." Ulrich also tried to explain that Hill was not Hildebrant. Stallings would not listen and informed Ulrich to shut up or he, Stallings, would take care of him too.

Stallings next got out of his truck with the handgun. It simultaneously occurred to Hill that Ulrich had a .44 caliber pistol and ammunition in the Bronco. As Hill and Ulrich were securing the pistol and ammunition, Stallings scurried around the back of his truck to a position approximately twelve to fifteen feet in front of the Bronco. Stallings then fired at least one shot at Hill and Ulrich, but did not hit either one of them. In response, Hill handed to Ulrich his loaded .44 caliber pistol. Stallings took cover on the driver's side of his truck and, unbeknown to Hill and Ulrich, switched his handgun for a shotgun. Hill, in the meantime, engaged the Bronco's transmission and began to speedily leave the parking lot. Just as the cab portion of the Bronco cleared the driver's side of Stallings' truck, Stallings, who was leaning against his truck, fired several shotgun blasts at the Bronco's tires and, after allegedly being shot in the leg by Ulrich, "shot one more time at the guy, or the passenger of the vehicle ... [hitting] him in the face with the shotgun."[1]

Hill and Ulrich proceeded out of the parking lot and headed south of town, apparently fearing that Stallings would give chase. Stallings, however, did not follow. Consequently, Hill pulled into a gas station just outside of the Pinedale city limits to evaluate the extent of Ulrich's injuries. After determining that they were serious, Hill returned to Pinedale to seek medical attention. A local doctor was initially consulted and recommended that Ulrich be transported to Salt Lake City, Utah, for further treatment. Ulrich's right eye was surgically removed at the Utah hospital, as were the pellets that were lodged in his face and right hand.

After discovering that Stallings was an uninsured motorist, Ulrich submitted a first party claim to his insurance carrier, USAA, for uninsured motorist (UM) benefits. USAA denied Ulrich's claim on the ground that his injuries did not "arise out of the ownership, maintenance or use of the uninsured motor vehicle," as required under the policy. Ulrich then filed a declaratory judgment action against USAA in district court to resolve the coverage dispute. After a hearing on cross-motions for summary judgment, the district court also determined that UM coverage did not exist. Specifically, the district court concluded that Ulrich's injuries did not arise out of Stallings' use of his vehicle, as the vehicle was merely the "situs" of the shooting. The district court accordingly granted summary judgment to USAA. This appeal followed.

## STANDARD OF REVIEW

When reviewing the propriety of a summary judgment, this court examines the record from the vantage point most favorable to the party opposing summary judgment to determine whether there exists a genuine issue of material fact to preclude disposition of the case as a matter of law. A genuine issue of material fact exists when a disputed fact, if proved, would have the effect of establishing or refuting an essential element to the cause of action or defense asserted by the parties. If upon such review no genuine issue of material fact is found to exist, we will uphold a summary judgment under any legal theory properly supported by the record.

*Evansville v. Suomi*, 836 P.2d 325, 328 (Wyo.1992) (citation omitted).

---

1. Gus Stallings pled guilty to the crime of attempted manslaughter and was sentenced to a term of confinement in the Wyoming State Penitentiary.

## DISCUSSION

A review of the record from a vantage point most favorable to Ulrich fails to disclose a genuine issue of material fact which would preclude the disposition of this case as a matter of law. The record reflects that Ulrich was the only person deposed in connection with this case. Ulrich and USAA subsequently filed cross-motions for summary judgment on the UM coverage issue. Ulrich's motion was supported by his deposition testimony, by his affidavit, and by the affidavit of Darrin Hill. Ulrich's motion was later supplemented by a portion of Gus Stallings' testimony as transcribed at his criminal arraignment. USAA did not submit any documentation with its motion to controvert Ulrich's factual assertions. Rather, USAA's position throughout has been that the facts, viewed in Ulrich's favor, fail to give rise to a claim of UM coverage as a matter of law. Given USAA's position, we perceive no factual dispute to be resolved by a jury and proceed to resolve this case as a matter of law. *See State Farm Fire and Cas. Co. v. Paulson,* 756 P.2d 764, 766 (Wyo.1988).

Resolution of this case requires that we confront two interrelated legal issues. We must first determine if Wyoming's Uninsured Motorist Act (WUMA), Wyo.Stat. §§ 31–10–101 to –104 (1989), requires insurance carriers to offer UM coverage which would extend to the circumstances of this case. This line of inquiry is dictated by recognition that insurance may not be offered in contravention of the minimum statutory requirements. 8C John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 5069.35 (1981). If the first issue is not resolved affirmatively, we must direct our attention to the UM provision of the parties' insurance contract. Our objective then becomes to determine the scope of UM coverage intended by the parties and to give effect to such intent. *Commercial Union Ins. Co. v. Stamper,* 732 P.2d 534, 539 (Wyo.1987).

### 1. *Wyoming Uninsured Motorist Act.*

An accurate understanding of the scope and intent of Wyoming's Uninsured Motorist Act (WUMA) is best garnered by briefly reviewing its relationship to Wyoming's Motor Vehicle Safety–Responsibility Act (WMVSRA), Wyo.Stat. §§ 31–9–101 to –414 (1989). WMVSRA, in a nutshell, provides that each person involved in a "motor vehicle accident" must submit proof of financial responsibility[2] to the Department of Transportation within thirty days of the Department's receipt of the accident report. Wyo.Stat. § 31–9–103 (Supp.1992) and Wyo.Stat. § 31–9–202 (1989). Failure to submit proof of financial responsibility within the requisite time period results in suspension of both driving privileges and vehicle registration. Wyo.Stat. § 31–9–202 (1989). While proof of financial responsibility may be demonstrated in various ways, the thrust of WMVSRA is to encourage motorists to procure and maintain automobile liability insurance so that victims of "motor vehicle accidents" will have a reliable source from which to seek compensation for their injuries. *See generally,* Wyo.Stat. §§ 31–9–101 to –414 (1989 & Supp.1992).

The legislature, cognizant of the fact that not all motorists would carry liability insurance, passed WUMA as a necessary companion to WMVSRA. WUMA § 31–10–101 furthers the legislature's compensatory objective by requiring insurance carriers to offer UM coverage with every liability policy issued in Wyoming, unless such coverage is specifically rejected by the insured.[3] If UM coverage is purchased, the

---

**2.** Wyo.Stat. § 31–9–102(a)(xi) (1989) provides: "Proof of financial responsibility" means evidence of ability to respond in damages from liability, resulting from accidents occurring subsequent to the effective date of the proof, arising out of the ownership, maintenance or use of a motor vehicle, in the amount of twenty-five thousand dollars ($25,000.00) because of bodily injury to or death of one (1) person in any one (1) accident, and subject to

the limit for one (1) person, in the amount of fifty thousand dollars ($50,000.00) because of bodily injury to or death of two (2) or more persons in any one (1) accident * * *.

**3.** Wyo.Stat. § 31–10–101 (1989) provides: No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any natural person arising out of the ownership, maintenance or

net effect is to place a person injured by an uninsured motor vehicle in essentially the same position that he would have been in had the uninsured motorist carried liability insurance as prescribed by WMVSRA. Glenn E. Smith, *The Wyoming Uninsured Motorist Act: A Regulatory Reconciliation of Mandated Coverages with the Standard Uninsured Motorist Endorsement,* 11 Land & Water L.Rev. 213, 215 (1976).

Specifically addressing § 31–10–101, this court has stated:

> [T]he purpose of uninsured-motorists insurance coverage is to provide to innocent automobile accident victims an *opportunity* to procure a means of insulating themselves from damages incurred as a result of unfortunate and far too frequently occurring automobile collisions with uninsured motorists.

*Stamper,* 732 P.2d at 537 (emphasis in original).

Applying the plain and ordinary meaning to the terms "motor vehicle accident," "automobile accident," and "automobile collisions," we perceive no legislative intent which would require insurance carriers to be answerable under the UM coverage mandated by statute for injuries sustained from instrumentalities other than motorized vehicles, i.e., for injuries inflicted by gun, knife, club, fist, etc. during an intentional criminal assault. *See Cerullo v. Allstate Ins. Co.,* 236 N.J.Super. 372, 565 A.2d 1125, 1127–28 (1989) (interpreting legislative intent underlying New Jersey UM statute). Consequently, we proceed to the second stage of our analysis.

### 2. *Insurance Contract.*

■ Parties to an insurance contract are free to bargain for coverage greater than that mandated by statute, unless con-

use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death as provided by W.S. 31–9–102(a)(xi), under provisions approved by the insurance commissioner for the protection of persons insured thereunder or legally entitled to recover damages from owners or

trary to public policy. *See Stamper,* 732 P.2d at 536. The public policy prohibition against procuring liability insurance for intentional misconduct is not applicable in this context. UM insurance is a form of casualty, rather than liability insurance. 3 Rowland H. Long, *The Law of Liability Insurance* § 24.02 (1991). Accordingly, we look to the USAA policy to determine whether the "casualty" which befell Ulrich is among the risks which the parties reasonably intended to be covered by the UM provision of their contract. 6B Appleman, *supra* § 4317.

The UM provision of the USAA policy provides:

> We will pay compensatory damages which a **covered person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of **BI** [bodily injury] sustained by a **covered person** and caused by an accident.
>
> The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the uninsured motor vehicle.

■ The parties do not dispute that Ulrich was a covered person within the meaning of the policy; that he would legally be entitled to recover from Stallings for his injuries; that Stallings' vehicle was uninsured; or that Ulrich's injuries, when viewed from his perspective, were accidentally incurred. The sole matter at issue is whether Ulrich's injuries "ar[o]se out of the ownership, maintenance or use" of Stallings' uninsured motor vehicle.

In *Worthington v. State,* 598 P.2d 796 (Wyo.1979), this court set forth an analysis for construing an "arising out of the ownership, maintenance or use" clause in a liability insurance policy which we believe

operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. Unless the named insured requests the coverage in writing, the coverage need not be provided in or supplemental to a renewal policy where the named insured had rejected the coverage in connection with the policy previously issued to him by the same insurer.

is equally applicable to the same or similar clause of an UM insurance provision. The *Worthington* case originated from an automobile accident which occurred on a state highway that had been recently resurfaced. Mark Scott had been traveling eastbound on the highway when his vehicle broke down, forcing him to pull off onto the highway's shoulder. Kelly Worthington, noticing Scott's predicament, pulled nose-to-nose with the Scott vehicle to illuminate the area while Scott tried to fix his vehicle. As Scott was standing between the two vehicles and Worthington was seated in her vehicle, the Scott vehicle was hit from behind by Edward Malar, a partially blind motorist. The impact propelled the Scott vehicle into the Worthington vehicle. Scott lost both legs as a result of being pinched between the vehicles; Worthington sustained a severe neck injury which led to total paralysis. Malar explained that a dust storm, coupled with the lack of road lines, caused him to wander off the road and collide with the Scott vehicle.

Scott and Worthington, the plaintiffs, filed separate lawsuits against the state of Wyoming to recover damages for their injuries. They asserted that the state had waived immunity from suit to the extent that it held liability insurance and that their injuries fell within the purview of such insurance. The state's insurance policy obligated the carrier:

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of (A) *bodily injury sustained by other persons,* and
> (B) property damage,
> caused by accident *arising out of* the ownership, maintenance or *use,* including loading or unloading, of the owned motor vehicle.

*Worthington,* 598 P.2d at 805–06 (emphasis in original).

The plaintiffs argued that, because state owned vehicles were used to obliterate the road lines and because the nonexistence of road lines was a contributing cause of the accident, their injuries "ar[ose] out of" the use of the state owned vehicles. The court,

rejecting the plaintiffs' reasoning, set forth the following analysis:

> The primary objective of interpreting an insurance contract is to ascertain what the parties reasonably intended as its object and to ascribe to the terms used their plain, ordinary and customary meaning in order to effectuate the intent of the parties. When there are any ambiguities or uncertainties in the meaning of the language used in a policy, they must be strictly construed against the insured who drafted the contract. However, if the language is clear and unambiguous, there is no room for the court to resort to a strict construction against the insurer, and the insurance policy must be interpreted according to the ordinary and the usual meaning of its terms.

*Worthington,* 598 P.2d at 806 (citations omitted).

Applying the foregoing rules of contract construction, the court determined that the "arising out of" clause unambiguously expressed the parties' intent that liability coverage existed for injuries which resulted as a natural consequence from the use of an insured vehicle. The court then expounded upon what has been coined the "natural consequences" test as follows:

> In determining whether an injury arose out of use, the evidence must demonstrate that it was the natural and reasonable incident or consequence of the use of an insured vehicle, the causal connection being reasonably apparent. If the injury was directly caused by some independent or intervening cause wholly disassociated from, independent of or remote from the use of the automobile, the injury cannot be held to arise out of its use. The resolution of the question necessarily depends to a great degree upon the particular facts presented by each individual case.

*Worthington,* 598 P.2d at 807 (citations omitted).

The *Worthington* court applied the "natural consequences" test to the facts of the case to conclude that the plaintiffs' injuries did not fall within the risks reasonably covered by the state's liability insurance

contract. The court noted that intervening acts of negligence rendered any causal connection between the state-owned vehicles and the plaintiff's injuries legally remote. *Worthington*, 598 P.2d at 809.

 Before we apply the "natural consequences" test to the instant case, it is necessary that we address Ulrich's contention that the "some nexus" analysis applied in *General Acc. Ins. Co. of Am. v. Olivier*, 574 A.2d 1240 (R.I.1990), best reflects the parties' intent regarding the scope of coverage provided by UM insurance. The "some nexus" test basically provides that, absent an express provision to the contrary, UM coverage will be found when there exists "some nexus" between the operation, maintenance or use of an uninsured motor vehicle and the injury to the insured. In *Olivier*, an uninsured motorist was involved in a fender-bender with a vehicle in which Olivier was a passenger. As the police were conducting a post-accident investigation, the enraged uninsured motorist intentionally shot and killed Olivier as she stood along the roadside. The Rhode Island Supreme Court, relying almost exclusively upon the "some nexus" case of *Gov't Employees Ins. Co. v. Novak*, 453 So.2d 1116 (Fla.1984), held that there existed a sufficient nexus between the accident and the shooting to find that Olivier's death "arose out of the use" of an uninsured motor vehicle. *Olivier*, 574 A.2d at 1243.

We find the minority approach of *Olivier* to be unpersuasive for several reasons. First, *Olivier* is factually distinguishable in that the accident was the sole cause of the assailant's fervor. In the case at hand, Stallings was primarily, if not exclusively, upset about the physical altercation that had taken place at the Cowboy Bar. Second, the *Novak* case relied upon by the *Olivier* court was not a UM coverage case, but rather was a personal injury protection (PIP) insurance case. In *Race v. Nationwide Mut. Fire Ins. Co.*, 542 So.2d 347 (Fla.1989), the Florida Supreme Court identified the differences between UM and PIP insurance and specifically rejected an invitation to interject the *Novak* "some nexus" analysis into the UM context. Third, and most importantly, because the use of an automobile has "some nexus" to almost any action undertaken in society, it is our persuasion that the test does not accurately reflect the intent of the parties regarding the scope of UM coverage. *See Gilbertson v. State Farm Mut. Auto. Ins.*, 845 F.2d 245, 248 (10th Cir.1988).

Ulrich also urges this court to follow the analysis in *Wyoming Farm Bureau Mut. Insur. Co. v. State Farm Mut. Auto. Ins. Co.*, 467 F.2d 990 (10th Cir.1972). The *Farm Bureau* court applied essentially a "but for" test to an "arising out of" clause of a liability insurance contract to find that coverage existed for a pedestrian who was injured by shattering glass from a bottle which was thrown from a passing vehicle. We believe that the "but for" test suffers from the same deficiency as the "some nexus" test, i.e., it is overly broad. Consequently, we adhere to the analysis set forth in *Worthington*, as it, and not *Farm Bureau*, is the definitive expression of Wyoming law in this area.

 Consistent with *Worthington*, we hold that the "aris[ing] out of" clause of the parties' UM insurance provision unambiguously expresses their intent that coverage extend for those injuries which occur as a natural consequence of the use of an uninsured motor vehicle.[4] Applying the "natural consequences" test to this case, we conclude the obvious: Ulrich's injuries did not occur as a natural consequence of the use of Stallings' uninsured motor vehicle, but rather occurred as a natural consequence of Stallings' intentional use of a loaded firearm. Stallings' intentional act of shooting was an independent, intervening cause of Ulrich's injuries which rendered Stallings' use of his uninsured motor vehicle legally insignificant.[5] Consequently, we hold that Ulrich's injuries did not

---

**4.** The essence of the "natural consequences" test is perhaps best captured by Appleman: "The accident [the event giving rise to injury] must have arisen out of the inherent nature of the automobile, as such." 6B Appleman *supra* § 4317 at 367–68.

**5.** Long comments in his treatise on insurance law:

"arise out of the ownership, maintenance or use of an uninsured motor vehicle" as required by the UM provision of his USAA liability insurance policy.[6] As we ended our analysis in *Worthington,* we end our analysis here: "The scope of coverage afforded by the type of insuring clause in question must end at some point, and this case represents a point well-beyond the line that must reasonably be drawn." *Worthington,* 598 P.2d at 809 (citing *Asso. Independent Dealers, Inc. v. Mutual Serv. Ins. Cos.,* 304 Minn. 179, 229 N.W.2d 516, 519 (1975)).

## DISPOSITION

The district court's judgment and order which granted to USAA its motion for summary judgment is affirmed.

CARDINE, Justice, dissenting, with whom URBIGKIT, Justice, joins.

I believe the law cited in the opinion of the court supports a finding for appellant, and for that reason I would reverse the summary judgment. The second altercation that resulted in Ulrich's injury began with Stallings using his pickup to block Ulrich and Hill to prevent their driving away from the service station. Stallings then moved his vehicle to parallel with Ulrich. A reasonable inference a jury might draw from these facts is that once having blocked Ulrich from leaving, Stallings moved his vehicle to get a better shot at the Ulrich vehicle and to conceal himself from return fire.

For Ulrich to be covered under the uninsured motorist provision of his policy, his injury must "arise out of the ownership, maintenance, or use of" the uninsured vehicle. The injury is held to arise out of the use of the vehicle if

> it was the natural and reasonable incident or consequence of the use of an insured vehicle, the causal connection being reasonably apparent.

*Worthington v. State,* 598 P.2d 796, 807 (Wyo.1979). What is meant by the quoted language in unclear. It could be held to mean that the natural and reasonable consequence of the use of an insured vehicle is an accident involving the vehicle. Or it could mean the incident which follows be reasonably expected from the use being made of the vehicle, whatever that might be. I would hold the latter.

Continuing,

> If the injury was directly caused by some independent or intervening cause wholly disassociated from, independent of or remote from the use of the automobile, the injury cannot be held to arise out of its use.

*Id.* In the fact scenario of this case, it would be impossible to say that the cause of the injury was *"wholly* disassociated from, *independent of or remote* from the *use* of the automobile."* (emphasis added)

Finally, it is said:

> The resolution of the question necessarily depends to a great degree upon the particular facts presented by each individual case.

*Id.*

Nor do I conclude that *Wyoming Farm Bureau Mutual Ins. Co., Inc. v. State*

---

Clearly, there can be no coverage under the uninsured motorist provisions where the injuries do not arise out of the ownership, maintenance and use of a vehicle; therefore, no recovery can be had where the injuries are the result of an assault or similar intentional act where the instrumentality is not the automobile but rather is a gun, baseball bat, fist or similar instrument since the injuries can be found to have been caused by an intervening cause.

3 Long *supra* § 24.15.

**6.** For intentional shooting cases in which the courts have denied UM coverage, *see, e.g., Wausau Underwriters Ins. Co. v. Howser,* 727 F.Supp. 999 (D.S.C.1990); *State Auto. Mut. Ins. Co. v.*

*Nichols,* 710 F.Supp. 1359 (N.D.Ga.1989); *Fowler v. State Farm Mut. Auto. Ins. Co.,* 548 So.2d 830 (Fla.App.1989); *Curtis v. Birch,* 114 Ill. App.3d 127, 69 Ill.Dec. 873, 448 N.E.2d 591 (1983); *Hamidian v. State Farm Fire & Casualty Co.,* 251 Kan. 254, 833 P.2d 1007 (1992); *Kessler v. Amica Mut. Ins. Co.,* 573 So.2d 476 (La.1991); *McIntosh v. State Farm Mut. Auto. Ins. Co.,* 474 N.W.2d 227 (Minn.App.1991); *Coleman v. Sanford,* 521 So.2d 876 (Miss.1988); *Roberts v. Grisham,* 487 So.2d 836 (Miss.1986); *Ford v. Monroe,* 559 S.W.2d 759 (Mo.App.1977); *Sciascia v. American Ins. Co.,* 183 N.J.Super. 352, 443 A.2d 1118 (1982); *Kish v. Central Nat. Ins. Group of Omaha,* 67 Ohio St.2d 41, 21 O.O.3d 26, 424 N.E.2d 288 (1981).

*Farm Mutual Automobile Ins. Co.,* 467 F.2d 990 (10th Cir.1972) states a "but for" rule. In this case a bottle was thrown from an auto as the driver swerved the car. The bottle broke, causing an eye injury to a bystander. The court stated:

> [T]he sole issue is whether as a matter of law the injury was an accident arising out of the ownership, maintenance or use of the motor vehicle within the meaning of the State Farm policy.

*Id.* at 993. The court then stated:

> The numerous cases which have construed the clause that we have before us hold in effect, if not directly, that the relationship between the use of the vehicle and the injury complained of need not be a direct one. * * * The courts do scrutinize the facts and require that the negligent act and the injury be fairly proximate. * * *
>
> * * * In our case there is a "but for" connection *and more.* The evidence here is amply sufficient to support a conclusion that the use of the automobile was a substantial factor in the production of the injury.
>
> * * * * * *
>
> * * * [T]he causal relationship need not be a direct one; that it is sufficiently connected if the act which causes the injury is incident to the use of the vehicle. * * * We hold, therefore, that the breaking of the bottle and the injury to Harvey were not legally remote in relationship to the use of the vehicle.

*Id.* at 993–95 (emphasis added). The ownership/maintenance language has been used in these policies for a long period of time without change. If the insurer wished to confine "use" to incidents in which the insured automobile actually strikes a person or object directly causing injury, it could do so easily. A failure to restrict "use" in the policy demonstrates, for me, an intention to provide broad coverage beyond that defined by the court in this opinion.

In this case, a jury could find that the shooting was not "wholly disassociated from * * * the use of the automobile," was not "remote from the use," was a substan-

tial contributing factor to the injury, and, as then being used, the incident was reasonably to be expected. As the *Worthington* court said, "The resolution of the question necessarily depends to a great degree upon the particular facts presented by each individual case." 598 P.2d at 807. Accordingly, I would reverse the summary judgment entered in this case.